[Cite as *Baldwin v. Church of God of Trenton*, 2024-Ohio-1726.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| JESSICA BALDWIN, et al., | : | |
| Appellants, | : | CASE NO. CA2023-01-004 |
| | : | O P I N I O N |
| - vs - | | 5/6/2024 |
| | : | |
| THE CHURCH OF GOD OF TRENTON, OHIO, et al., | : | |
| | : | |
| Appellees. | : | |


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV 2021 10 1612


Graydon Head & Ritchey LLP, Roula Allouch and Kellie Ann Kulka, for appellants.

Lock Gordon Law Group, LLC, James H. Gordon and Jeremy R. Kopp, for appellees, The Church of God of Trenton, Ohio dba Noah's Ark Child Development Center and The Church of God of Trenton, Ohio dba Freedom House Church of God

Droder & Miller Co., L.P.A., Richard J. Rinear and Matthew C. Smallwood, for appellee, Walnut Grove Swim Club, Inc.


**BYRNE, J.**

{¶ 1} Plaintiff-appellant, Jessica Baldwin, individually and on behalf of her minor son Connor Adkins, appeals the judgment of the Butler County Court of Common Pleas granting summary judgment on her claims of reckless supervision and loss of consortium to defendants-appellees, The Church of God of Trenton, Ohio, d.b.a. Freedom House

Church of God and Noah's Ark Child Development Center (collectively "Noah's Ark") and Walnut Grove Swim Club, Inc. For the reasons that follow, we affirm.

### I. Facts and Procedural History

{¶ 2} Connor's parents had been divorced before the events in this case occurred, and they shared legal custody of Connor. In 2018, Connor spent most of the year living with his father, Erick Adkins, in Ohio, and around six weeks in the summer living with his mother, Jessica Baldwin, who then lived in Georgia.

{¶ 3} At the beginning of the summer that year, Connor was six years old, and Adkins enrolled him in a daycare run by Freedom House Church of God called Noah's Ark Child Development Center. Stacy Dodge, the daycare's director, had several swimming activities planned for the children that summer, including regular visits to Walnut Grove Swim Club. Noah's Ark sent a "Swimming Permission Slip" home with Connor asking for a parent's permission for Connor to participate and asking the parent to designate Connor as a "swimmer" or a "non-swimmer." The permission slip stated that "children who are non-swimmers will wear an orange wrist band" and that "children who are swimmers will wear a green wrist band." The permission slip also stated, "At these activities we will provide additional child care staff above licensing ratio requirements."[1] Connor's father signed the permission slip and designated Connor a "non-swimmer."

{¶ 4} On June 4, 2018, after lunch, Dodge and 12 adult staff members of Noah's Ark took Connor and 55 other children to Walnut Grove Swim Club to swim in its pool. Walnut Grove had two teenaged lifeguards on duty that day—Sam Schenck, who was watching the deep end of the pool, and Callie Hunt, who was watching the shallow end. It was Hunt's first day working as a lifeguard, and it was Noah's Ark's first planned visit to

---

1. Normally, the ratio of children to teachers was 18:1, but on field trip days Noah's Ark ensured the ratio was 10:1.

Walnut Grove that summer. Typically, there would have been only one lifeguard, but Noah's Ark had requested that there be two that day due to the number of children who would be in the pool. The pool had a shallow end with a depth that started at three feet and gradually deepened to five feet, before dropping off to the deep end. The shallow-end lifeguard's chair was positioned at the five-foot depth, directly across from one of the pool's entry-and-exit ladders. "Non-swimmers" were not permitted beyond this lifeguard's chair. Each Noah's Ark child wore a colored wristband; 31 children wore a green "swimmer" wristband and 26 children, including Connor, wore an orange "non-swimmer" wristband. The lifeguards knew that the wristbands identified the swimming status of the Noah's Ark children, but they did not know which color was associated with which status. Noah's Ark had not told the swim club what the colors meant.

{¶ 5} In addition to the lifeguards, Noah's Ark staff members kept an eye on the swimming children. Two staff members were in the pool with the children, while the others sat around the perimeter of the pool watching the children. Noah's Ark had instructed those sitting around the pool to spread out so that there was about six feet of space between each staff member. And Noah's Ark was granted permission from Walnut Grove for its staff members to sit in chairs around the pool edge—giving them a vantage point from which to watch the swimmers that was both higher and closer than normally permitted. While Noah's Ark did not require a particular number of staff members to watch a particular section of the pool, more staff members were watching the shallow end. Typically, during field trips, Noah's Ark staff members would regularly count the children to ensure that they had them all. That was all but impossible when the children were in the pool, as they were constantly moving and mixing with other swimmers. So Noah's Ark had assigned staff members to a group of children for which they were responsible. Each group had two staff members and generally no more than seven children. Each group leader was responsible for making sure

that all the children in their group were accounted for and helping them with things like applying sunscreen and getting snacks.

{¶ 6}   The Noah's Ark group arrived at the pool sometime after 1:00 p.m.   Other children were already swimming, and after Noah's Ark arrived, there were between 50 and 70 children in the pool at any given time.

{¶ 7}   The swim club scheduled a 15-minute break each hour, during which time everyone was required to be out of the pool.  At a quarter before the hour, the lifeguards would blow their whistles to signal the break.  Knowing this, Noah's Ark had instructed the children that when they heard the lifeguards blow their whistles, they should immediately exit the pool.

{¶ 8}   At 1:45 p.m., lifeguards Schenck and Hunt blew their whistles for the hour's break.  When Connor heard the whistle, he was hanging on the wall of the pool in the shallow end, across from Hunt, talking to other children.   Connor described (at his deposition) what happened next:

> So, I was hanging on the wall and then I like pushed off and then started sucking in water on accident. * * *
>
> I sucked in too much water and then I started and I was saying help, but I don't think anyone could hear me because I was probably talking low because there was a bunch of water in my mouth.  And then I remember going over to the stairs and I was really close and then it blacked out. * * *
>
> So when I pushed off, I saw some older kids and then I asked them for help but they didn't hear me, so then I was swimming over to the stairs. * * *

Connor said that he was "just pushing off" when he went under the water.  He did not recall being all the way under the water.  He said that there was "one kid who was swimming that was splashing in my face and I don't think they knew it * * * it didn't really cause me to go under water, but it was a reason."  Connor did not make it to the ladder.

{¶ 9} Hunt, the new lifeguard, testified at her deposition that she was getting down from her chair and noticed, directly across from her, that Connor and three other children were moving toward the ladder. She testified that she was not sure if Connor needed help or if he was just taking a while to get out of the pool. (It was a common occurrence, Hunt said, for some children to delay getting out of the pool and even to pretend like they did not hear the whistle.) She explained that Connor was "moving his arms and his legs, and he was above the water" and appeared to be swimming. While she watched Connor, Hunt grew concerned because he appeared to be having trouble reaching the ladder. She testified:

> [Connor] was still above water when he was reaching for the ladder, trying to get it. So he looked like he was still swimming. [But] [a]fter he tried to reach it a few times, his head went under. * * * There's a ledge at the bottom of the pool, like next to the ladder, so he was standing on that, I would assume, and he slipped and went under. And then me and [Schenck] looked at each other, and then [Schenck] got in. Because he just went under really quick. * * * [H]e just went straight down really quick. And that's the only way I would describe about how that would happen. * * * Like, he went down, and then his face was in the water. So his head was above the water, and then it wasn't anymore.

{¶ 10} Schenck, the other lifeguard, testified at his deposition that after blowing his whistle he had waited for the deep end to clear before walking around to Hunt's chair beside the shallow end. When Hunt pointed out Connor under the water, Schenck could see that Connor was not moving and was "facing down," so he immediately dove into the pool. Schenk lifted Connor out of the pool and yelled for Hunt to call 911.

{¶ 11} By that time Connor's heart had stopped and would not start beating again for 14 minutes. A Walnut Grove pool manager, who was also a certified nurse, immediately began administering CPR. Connor was ultimately airlifted to Cincinnati Children's Hospital. The medical team had difficulty stabilizing him and advised his parents at one point that it

was "not looking good." Connor was placed on advanced life support where he remained for three days. He was in a coma for another two days before he awakened. After that, Connor had seven or eight "ministrokes" in his brain. It was not until almost a week after that day at the pool that doctors became confident that Connor would survive.

{¶ 12} On July 29, 2019, Jessica Baldwin, Connor's mother, filed suit against Noah's Ark and Walnut Grove Swim Club, asserting claims of negligence and loss of consortium. She later voluntarily dismissed the case. On October 28, 2021, Baldwin re-filed the lawsuit, this time asserting a claim of reckless supervision against Noah's Ark and a claim against Walnut Grove that it had intentionally, maliciously, or recklessly created an unreasonable risk of harm by maintaining hazardous conditions. Against both defendants Baldwin also again asserted a claim for loss of consortium. Connor's father, Adkins, did not participate in either lawsuit, and is therefore not a party to this appeal.

{¶ 13} Each defendant moved for summary judgment based on the defense of primary assumption of risk, arguing that Connor had voluntarily assumed the risk of drowning and that neither defendant had acted intentionally or recklessly to cause Connor's injuries. The trial court agreed and granted summary judgment to both Noah's Ark and Walnut Grove on all of Baldwin's claims. The court concluded that Connor had been voluntarily participating in the recreational activity of swimming and had assumed the inherent risk of drowning. And the court concluded that nothing Noah's Ark or Walnut Grove had done or not done could be considered intentional or reckless.

{¶ 14} Baldwin appealed.

## II. Analysis

{¶ 15} Baldwin assigns four errors to the trial court. As an initial matter, we note that Baldwin settled with Walnut Grove while this appeal was pending. So to the extent that the assignments of error relate to Walnut Grove, they are moot. We will address Baldwin's

assignments of error only to the extent they concern Noah's Ark.

**A. The Primary-Assumption-of-Risk Defense**

{¶ 16} Baldwin's first assignment of error states:

> THE TRIAL COURT ERRED BY GRANTING DEFENDANT NOAH'S ARK'S MOTION FOR SUMMARY JUDGMENT.

{¶ 17} Baldwin's second assignment of error states:

> THE TRIAL COURT ERRED BY GRANTING DEFENDANT WALNUT GROVE'S MOTION FOR SUMMARY JUDGMENT.

{¶ 18} Baldwin argues in the first assignment of error that there existed a genuine issue of material fact as to whether special or attendant circumstances rendered the primary-assumption-of-risk defense inapplicable. Even if the defense does apply, argues Baldwin, there existed a genuine issue of material fact as to whether Noah's Ark was reckless. The second assignment of error is moot, due to Baldwin's settlement with Walnut Grove.

**1. Standard of Review**

{¶ 19} We review a trial court's decision granting summary judgment de novo, using the same standard as the trial court. *Tallarigo v. Dryden*, 12th Dist. Clermont No. CA2013-06-045, 2013-Ohio-5496, ¶ 10. Under Civ.R. 56(C), summary judgment may be granted when "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

**2. Primary Assumption of Risk**

{¶ 20} The trial court found that the doctrine of assumption of risk applied to

Baldwin's claims. We agree.

{¶ 21} Assumption of risk is an affirmative defense that focuses on whether and to what degree, if any, the plaintiff assumed the risk of the harm incurred. *French v. New Paris*, 12th Dist. Preble No. CA2010-05-008, 2011-Ohio-1309, ¶ 33. Primary assumption of risk is a form of assumption of risk that involves activities with inherent risks that cannot be eliminated. *McLoughlin v. Williams*, 12th Dist. Clermont No. CA2015-02-020, 2015-Ohio-3287, ¶ 17. The primary-assumption-of-risk doctrine is most often applied to limit tort liability for negligence in sports and recreational activities. *Gentry v. Craycraft*, 101 Ohio St.3d 141, 2004-Ohio-379, ¶ 11. The application of the primary-assumption-of-risk doctrine to recreational activities "is based on the rationale that a participant to a * * * recreational activity accepts the risks associated with the * * * activity." *Pope v. Willey*, 12th Dist. Clermont No. CA2004-10-077, 2005-Ohio-4744, ¶ 8. "By choosing to participate in an activity, the participant implicitly accepts those risks." *Deutsch v. Birk*, 189 Ohio App.3d 129, 2010-Ohio-3564, ¶ 12 (12th Dist.).

{¶ 22} "Primary assumption of the risk means that a defendant owes no duty [of care] whatsoever to the plaintiff." *Horvath v. Ish*, 134 Ohio St.3d 48, 2012-Ohio-5333, ¶ 18, citing *Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 432 (1996). Under the doctrine, "'[w]here individuals engage in recreational or sports activities, they assume the ordinary risks of the activity and cannot recover for any injury unless it can be shown that the other participant's actions were either reckless or intentional.'" *Id.*, quoting *Marchetti v. Kalish*, 53 Ohio St.3d 95 (1990), syllabus.

{¶ 23} The primary-assumption-of-risk doctrine applies equally to claims involving the supervision of a child participating in a recreational activity. *See Main v. Gym X-Treme*, 10th Dist. Franklin No. 11AP-643, 2012-Ohio-1315, ¶ 9 ("The doctrine applies regardless of whether the activity was engaged in by children or adults, or was unorganized,

supervised, or unsupervised."), quoting *Gentry v. Craycraft*, 101 Ohio St.3d 141, 2004-Ohio-379, ¶ 8); *Main* at ¶ 15 ("negligent supervision is not an exception to primary assumption of the risk"); *Drury v. Blackston*, 3d Dist. Allen No. 1-15-39, 2015-Ohio-4725, ¶ 12 (stating that the assumption of responsibility for supervising a child is immaterial to application of the doctrine), citing *Kinnison v. Ohio State Univ.*, 10th Dist. Franklin No. 13AP-501, 2013-Ohio-5715, ¶ 9 ("If children are injured in recreational pursuits that involve inherent risks, intentional or reckless conduct is necessary if liability is to be established."). Therefore, when tortious supervision of a child engaged in a recreational activity that involves inherent risks is alleged, the plaintiff must show intentional or reckless conduct, that is, that the defendant intentionally or recklessly failed to provide appropriate supervision. *See Whalen v. T.J. Automation, Inc.*, 2019-Ohio-1279, 134 N.E.3d 869, ¶ 26 (3d Dist.).[2]

**{¶ 24}** There is no doubt that "[s]wimming is a recreational activity." *Drury* at ¶ 12, citing *Estate of Vince v. Estate of Smallwood*, 11th Dist. Trumbull No. 2005-T-0017, 2006-Ohio-1697, ¶ 20; *Whalen* at ¶ 24; *Salyer v. Brookview Village Condominium Assn.*, 5th Dist. Fairfield No. 18-CA-08, 2018-Ohio-2255, ¶ 21. Nor is there any doubt that "[d]rowning is an inherent risk of swimming." *Salyer* at ¶ 21, citing *Mullens v. Binsky*, 130 Ohio App.3d 64, 70 (10th Dist.1998); *Whalen* at ¶ 24. *See also Kinnison* at ¶ 7-11. As a result, courts routinely apply the doctrine of assumption of risk to claims arising from injury or death while swimming. *See, e.g., Whalen* at ¶ 29 (five-year-old who drowned while swimming in a pond); *Drury* at ¶ 12 (four-year-old who swallowed water was swimming in backyard pool); *Sharpley v. Bole*, 8th Dist. Cuyahoga No. 83436, 2004-Ohio-5729, ¶ 18 (17-year-old who

---

2. The dissent criticizes our citation of *Whalen*, which the dissent points out is distinguishable on a factual basis. But we have cited *Whalen* for its discussion of various general principles of law that are applicable in this case. Contrary to the dissent's suggestion, nothing about *Whalen*'s facts makes the general principles of law for which we cite *Whalen* inapplicable in this case.

drowned while swimming in a pond). It logically follows that injury from *nearly* drowning is also an inherent risk of swimming.

{¶ 25} In this case, Connor suffered injury from nearly drowning while swimming in a pool. There is no dispute that Connor's participation in the activity was voluntary. Therefore his near drowning was an inherent risk that he had assumed, and the assumption-of-risk doctrine applies.

### 3. Special or Attendant Circumstances

{¶ 26} The primary-assumption-of-risk doctrine bars recovery for injury that is the result of an inherent risk of an activity. *Young v. Eagle*, 12th Dist. Clermont No. CA2016-09-063, 2017-Ohio-7211, ¶ 23. But a special or attendant circumstance can create an unusual danger, which is not an inherent part of the activity. When such a circumstance exists, the primary-assumption-of-risk doctrine does not apply, because the risk of injury was not one accepted by the participant. *See Gallagher*, 74 Ohio St.3d at 432. For example, the primary-assumption-of-risk doctrine would bar recovery against a baseball park operator if a spectator were hit by a ball during the normal course of a game. *See Cincinnati Base Ball Club Co. v. Eno*, 112 Ohio St. 175 (1925). But if a spectator were hit by a ball being used by players who were practicing very close to the stands between games, a factual question on attendant circumstances might exist. *Id.*

{¶ 27} Baldwin argues that Connor did not nearly drown because of a risk inherent to swimming but because of an unusual danger that arose as a result of a special or attendant circumstance created by Noah's Ark. This circumstance was created, says Baldwin, by three failures of Noah's Ark: (1) its failure to communicate its wristband policy to the Walnut Grove lifeguards, (2) its failure to properly supervise non-swimmers while they exited the pool, and (3) its failure to have a plan for non-swimmers to exit the pool safely. Baldwin contends that each of these failures was a special or attendant circumstance that

increased the risk of drowning, transforming that danger so that it was no longer an inherent part of swimming.

{¶ 28} We conclude that nothing Noah's Ark did—or failed to do—constituted a special or attendant circumstance. Viewing the evidence most strongly in favor of Baldwin, reasonable minds could conclude only that the acts and omissions of Noah's Ark identified by Baldwin did not create an unusual danger of drowning.

{¶ 29} *First*, Noah's Ark's failure to inform Walnut Grove of the meaning of the wristband colors was not an attendant circumstance. Connor, like all the children brought to Walnut Grove by Noah's Ark, both swimmers and non-swimmers, faced an inherent risk of drowning while in the swimming pool. *See Mullens v. Binsky*, 130 Ohio App.3d 64, 70 (10th Dist.1998) (a swimming pool poses a "risk of drowning, [that] is an open and obvious condition which even children of tender years are able to appreciate"). Noah's Ark's adoption of a wristband policy did nothing whatsoever to *increase* Connor's risk of drowning. Nor did Noah's Ark's failure to inform Walnut Grove's lifeguards of the meaning of the wristband colors *increase* Connor's risk of drowning. In fact, in terms of risk, there is no meaningful distinction between the situation here in which Noah's Ark failed to inform the lifeguards of the meaning of the wristband colors and the situation in which Noah's Ark did not have a wristband policy at all. In both situations, the lifeguards are unaware of the swimming status of each child, making the risk of drowning in each situation the same. This comparison shows that the lifeguards' lack of knowledge as to the meaning of Connor's wristband color was irrelevant to the level of drowning risk that he faced.

{¶ 30} This conclusion is supported by the undisputed facts. Connor's deposition testimony makes it clear that he began to drown because, in trying to exit the pool, he pushed off the wall, swallowed water, and went under the water. There is no evidence that the color of Connor's wristband was at all relevant in this situation—no evidence that it

contributed to Connor pushing off the wall and swallowing water, and no evidence that it had anything to do with how the lifeguards acted. Nothing in Hunt's testimony establishes that she could even see Connor's wristband—either when his head was still above the water or when his head went below the water—let alone that any hesitation in helping Connor had anything to do with the color of his wristband. As for Schenck, Connor was already underwater by the time he observed Connor, so the color of his wristband was also irrelevant to Schenck's actions. The undisputed facts thus demonstrate that Noah's Ark's failure to inform the Walnut Grove lifeguards what the two wristband colors meant did not hinder at all the lifeguards' ability to respond to the situation playing out before them. In addition, Noah's Ark's failure to share information about the wristbands with the lifeguards did not create a risk of drowning that sharing the information would have eliminated. This failure did nothing to make it more or less likely that a child would experience distress while swimming. Swimming always carries a risk of drowning that can never be eliminated. That inherent risk is in part why the primary-assumption-of-risk doctrine applies in cases like this.

{¶ 31} *Second*, Noah's Ark's failure to adopt a plan for non-swimmers to exit the pool was not an attendant circumstance. Baldwin does not cite any legal requirement that a daycare adopt such a plan, and we are aware of no such requirement. Moreover, that Noah's Ark had not adopted Baldwin's after-the-fact suggestion of an exit plan plainly could not have *increased* the risk of Connor drowning; it is only a measure that Noah's Ark could have taken to *decrease* that risk. But Noah's Ark had no obligation to *decrease* the risk of drowning. *See Rawlins v. Cleveland Indians Baseball Co.,* 8th Dist. No. 102574, 2015-Ohio-4587, 48 N.E.3d 136, ¶ 27 (stating that a provider or sponsor of a recreational activity has a duty "not to increase the risk of harm over and above the inherent risk of the sport"). If we were to agree with Baldwin's argument, we would, in effect, be imposing a requirement that a supervisor of children swimming in a pool must adopt a safety plan for "non-

swimming" children to exit the pool. Imposing such a requirement is not a proper prerogative of this court.

{¶ 32} *Third*, Noah's Ark's purported failure to supervise non-swimmers properly did not create an attendant circumstance. To the extent Baldwin argues that Noah's Ark should have developed a "plan" to supervise non-swimmers, this argument fails for the same reason that Baldwin's exit-plan argument fails. Noah's Ark did not have a duty to decrease the inherent risk of swimming. Additionally, the undisputed facts show that Noah's Ark did take steps to supervise non-swimmers—by asking Walnut Grove to provide a second lifeguard, spreading out its staff members both in and around the pool, asking Walnut Grove for special permission for its staff members to sit closer to the pool edge, dividing the children into groups for which one staff member was responsible, and more. To the extent Baldwin argues that Noah's Ark created an attendant circumstance when its staff members exited the pool upon hearing the lifeguards whistle and walked away to organize the children, this argument also fails because the staff members did nothing to *increase* the inherent risk of drowning. That a non-swimming child could begin to drown and that this not be observed by an adult is an inherent risk of entering a pool, not an unusual danger.

{¶ 33} Our dissenting colleague suggests that if Noah's Ark's staff members had not exited the pool area so quickly after the whistle was blown, "they would have seen Connor struggle to reach the ladder," "they would have seen his initial slip or misguided push-off from the side of the pool, then his attempt at requesting help, his getting splashed in the face, and eventually his inability to reach the ladder several times. * * * [T]hey would have seen him inhale water and then become unconscious * * *." But this is simply speculation. And "[m]ere speculation cannot create a genuine issue of material fact." *Davis v. Royal Stock Paper Co., Inc.*, 12th Dist. Clinton No. CA2021-09-028, 2022-Ohio-4135, ¶ 72 (citing cases). It is pure speculation to say that if Noah's Ark staff members had not left the pool

area, they would have seen Connor struggling to reach the ladder and asking for help, would have seen him get splashed, would have seen him inhale water, and would have immediately understood why he went under the water. The record simply does not reveal what would have happened if the staff members had acted differently. Moreover, this speculation about what Noah's Ark's staff members would have seen and understood is undercut by the fact that lifeguard Hunt, who *did* remain poolside and saw Connor in the moments before his head went under the water, did not see him asking for help, getting splashed, or inhaling water, and did not immediately understand that Connor was in distress.[3]

{¶ 34} In sum, there is no evidence here of an unassumed risk. Connor's father designated Connor as a non-swimmer, Noah's Ark gave Connor the wristband for non-swimmers, and it is undisputed that he was in the shallow end of the pool where he was supposed to be when he began to drown. There is no evidence of an unusual situation or an out-of-the-ordinary circumstance. When one enters a public pool, having to exit the pool upon hearing a lifeguard's whistle is foreseeable and customary. Drowning while attempting to do so is an inherent risk, especially for a non-swimmer. Neither the failure to communicate the wristband policy nor the alleged lack of proper staff supervision nor the lack of an exit plan increased that risk or created an attendant circumstance. Baldwin has not cited evidence indicating that there was an unusual or out-of-the-ordinary circumstance caused by Noah's Ark that resulted in Connor's being unable to reach the pool's ladder.

{¶ 35} Connor's near drowning, while tragic, is an ordinary example of the drowning risk inherent to swimming. It is irrelevant that he was only six years old or that he did not

---

3. Notably, as we have said, it was at Noah's Ark's request that there were two lifeguards that day and not only one. And contrary to the dissent's assertion, their presence poolside when Connor began to drown means that Connor was never left unattended in the pool.

appreciate the risk of pushing off the wall like he did. "[I]n a personal injury action brought for injuries sustained while an individual is a participant in * * * [a] recreational activity, the age of the participant * * * and whether he or she was capable of appreciating the inherent risks is immaterial." *Gentry*, 101 Ohio St.3d 141, 2004-Ohio-379, at ¶ 13. *See also Whalen*, 2019-Ohio-1279, at ¶ 29 (concluding based on *Gentry* that the recreational activity doctrine applied to five-year-old child who drowned while swimming in a pond).

{¶ 36} The Ohio Supreme Court stated in *Gallagher* that "[*i*]n many situations, * * * there will be attendant circumstances that raise questions of fact whether an injured party assumed the risk in a particular situation." (Emphasis added.) *Gallagher*, 74 Ohio St.3d at 432. This is not one of those situations. Considering the evidence in a light most favorable to Baldwin, we hold that reasonable minds could conclude only that Noah's Ark was not responsible for a special or attendant circumstance that created an unusual risk of drowning. There are no disputed issues of material fact that could suggest otherwise. So we conclude, like the trial court, that the primary-assumption-of-risk doctrine applies in this case.

### 4. Reckless Conduct

{¶ 37} Having concluded that the primary-assumption-of-risk doctrine shields Noah's Ark from any claim of negligence, the question now becomes whether Noah's Ark is subject to a claim for recklessly or intentionally causing Connor's injury. There is no allegation of intentional conduct, so our focus is on whether Noah's Ark was reckless. The inquiry is whether Noah's Ark engaged in reckless conduct before Connor nearly drowned— specifically, whether it recklessly failed to provide appropriate supervision.

{¶ 38} "[R]ecklessness is * * * a high standard." *Tallarigo*, 2013-Ohio-5496, at ¶ 19, citing *Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 118 Ohio St.3d 392, 2008-Ohio-2567, ¶ 37. "Reckless conduct is characterized by the conscious disregard of

or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. City of Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, ¶ 34, citing *Thompson v. McNeill*, 53 Ohio St.3d 102, 104-105 (1990), adopting 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965). "A person acts recklessly, in the most common formulation, when he 'consciously disregard[s] a substantial [and unjustifiable] risk that the conduct will cause harm to another.'" *Counterman v. Colorado*, ___ U.S. ___, 143 S.Ct. 2106, 2117 (2023), quoting *Voisine v. United States*, 579 U.S. 686, 694, 136 S.Ct. 2272 (2016).

{¶ 39} The recklessness standard "involves insufficient concern with risk, rather than awareness of impending harm." *Id.*, citing *Borden v. United States*, 593 U.S. ___, 141 S. Ct. 1817, 1824 (2021). In other words, "[t]h[e] risk need not come anywhere close to a likelihood. Speeding through a crowded area may count as reckless even though the motorist's 'chances of hitting anyone are far less [than] 50%.'" *Borden* at 1824, quoting 1 Wayne R. LaFave, *Substantive Criminal Law*, Section 5.4(f) (2018). Recklessness is a subjective standard. "[R]eckless defendants have done more than make a bad mistake. They have consciously accepted a substantial risk of inflicting serious harm." *Counterman* at 2118. In short, a reckless person is aware that another could be harmed by his conduct, but he engages in the conduct anyway. Thus recklessness "involv[es] a 'deliberate decision to endanger another.'" *Id.* at 2117, quoting *Voisine* at 694.

{¶ 40} "Recklessness * * * necessarily requires something more than mere negligence." *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, ¶ 73-74. Negligence is an objective standard: "A person acts negligently if he is not but should be aware of a substantial risk * * *." *Counterman* at 2117, fn. 5. Liability depends not on what the actor thinks about his conduct but rather on what "a reasonable person would think" about it. *Id.* "[T]he fault lies in the person's simple 'failure to perceive' the possible

consequence of his behavior." *Borden* at 1824. Accordingly, negligence is "mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency" or even "intentionally doing an act with knowledge that it contains a risk of harm to others." *Marchetti v. Kalish*, 53 Ohio St.3d 95, 100, fn. 3 (1990). Synonyms for negligence are "heedlessness, thoughtlessness, inattention, inadvertence and oversight." *Tighe v. Diamond*, 149 Ohio St. 520, 525 (1948). "It does not involve intent or a conscious purpose to do a wrongful act or to omit the performance of a duty." *Id.* at 526.

{¶ 41} In sum, while both "[r]ecklessness and negligence * * * involve insufficient concern with a risk of injury," *Borden* at 1824, a reckless person knows about the risk and acts anyway and a negligent person acts without awareness of the risk. Here, viewing the evidence most strongly in favor of Baldwin, reasonable minds could conclude only that Noah's Ark was not reckless, that it did not consciously disregard a substantial and unjustifiable risk that its conduct would cause a child to nearly drown.

{¶ 42} Baldwin argues that Connor almost drowned because of Noah's Ark's recklessness in failing to communicate the wristband policy to Walnut Grove. Moreover, says Baldwin, Noah's Ark did not require staff members to be in the pool with the children, did not assign staff members to supervise non-swimmers specifically, did not assign staff members to watch only their own group of children, did not have a staff member ensure that all children exited the pool safely, and did not have an exit plan for non-swimmers. Baldwin points to deposition testimony that a Noah's Ark staff member admitted that some staff members were "goofing off, [and] no one [was] paying attention to kids."[4]

---

4. Baldwin also argues that Noah's Ark failed to supervise non-swimmers adequately by not "actively supervising" them, as required by childcare regulations in the Ohio Administrative Code. The cited regulations govern supervision by childcare staff members at licensed childcare centers. A regulation dealing specifically

{¶ 43} There is some evidence that some staff members were perhaps, at times, not fully attentive to the swimmers and that there was no exit plan for non-swimmers and no staff member was assigned to watch the pool until all the children had exited. But none of this conduct created an unreasonable risk of drowning that Noah's Ark consciously disregarded. Any risk that it did create was not substantially greater than the risk involved in a standard negligence case. There is no evidence that Noah's Ark or any of its staff members knew about a particular risk but acted anyway, and no evidence that Noah's Ark was insufficiently concerned with the risk that a child would drown. There is no evidence that it was aware that not communicating the wristband policy or that supervising the children in the way that it did would make it likely a child would drown. There is no evidence that Noah's Ark knew that any of its conduct created a risk and that it went ahead with the conduct anyway. While our dissenting colleague argues that Noah's Ark's staff members acted recklessly when they promptly left the pool area upon the whistle being blown, there is no evidence that this act, or any other act of Noah's Ark, involved "'a deliberate decision to endanger another.'" *Counterman*, 143 S.Ct. 2106, at 2118, quoting *Voisine*, 579 U.S. 686, at 694.

{¶ 44} In fact, the evidence shows the opposite of a "deliberate decision to endanger another" that is necessary for recklessness. Noah's Ark was very concerned with the children's safety and took steps to prevent a child from drowning. Noah's Ark had asked Walnut Grove to provide an additional lifeguard that day, provided the children with

---

with swimming and water safety states that "[c]hild care staff members shall be actively supervising children pursuant to rule 5101:2-12-19 of the Administrative Code and shall be able to clearly see all parts of the swimming area including the bottom of pools." Ohio Adm.Code 5101:2-12-24(A)(1). The referenced regulation states that "[s]upervision includes awareness of and responsibility for the activity of each child and being near enough to respond and reach children immediately including responding to the child's basic needs and protecting them from harm." Ohio Adm.Code 5101:2-12-19(A)(1). Even if we were to find that Noah's Ark violated these regulations, Baldwin cites no authority for the proposition that the violation constitutes recklessness (or an attendant circumstance). Nor have we been able to locate any such authority.

instructions about what they were to do when hearing the lifeguard whistle, brought more staff members than usual and more than required by state licensing, instructed staff members about pool safety (including that they should watch the bottom of the pool), and adopted the wristband policy to distinguish between swimmers and non-swimmers. Noah's Ark also placed one or two of its staff members in the shallow end of the pool with the children, placed its remaining staff members spaced out around the edge of the pool, and obtained special permission from Walnut Grove for the staff members to sit close to the edge so that they could better watch the children.

{¶ 45} Baldwin's arguments, and those of our dissenting colleague, amount to assertions that Noah's Ark, at most, negligently failed to supervise non-swimming children adequately, that is, failed to supervise the children so as to protect them from a risk of which it should have been aware. But there is no evidence to show that Noah's Ark consciously disregarded a substantial risk of harm or made "'a deliberate decision to endanger another.'" *Counterman* at 2118, quoting *Voisine* at 694. Rather, the evidence shows that failing to communicate the wristband policy was mere inadvertence and that not supervising the children the way that Baldwin says Noah's Ark should have supervised them was, at worst, a failure to take additional precautions. While it is possible that in hindsight additional measures can be identified that Noah's Ark could have taken that may have prevented Connor's near drowning, there is no evidence that Noah's Ark acted or failed to act in a manner that demonstrates it "consciously accepted a substantial risk of inflicting serious

harm." *Id.*[5] Again, the issue here is recklessness—a subjective standard—not negligence.[6]

**{¶ 46}** Considering the evidence in a light most favorable to Baldwin, we conclude that reasonable minds could not disagree as to whether Noah's Ark consciously disregarded a substantial and unjustifiable risk that its conduct would cause a child to nearly drown. There are no disputed issues of material fact that could suggest otherwise.

**{¶ 47}** We recognize that, typically, the issue of reckless conduct is decided by a jury. *See Lemaster v. Grove City Christian School*, 10th Dist. Franklin No. 16AP-587, 2017-Ohio-8459, ¶ 9 ("Ordinarily the question of whether conduct was reckless is properly left for a jury"); *Whalen*, 2019-Ohio-1279, at ¶ 34 (quoting the same from *Lemaster*). But the Ohio Supreme Court has affirmed decisions granting summary judgment when the facts, when viewed favorably to the nonmoving party, do not meet the threshold for recklessness. *Id.*

---

5. **{¶ a}** The dissent accuses us several times of deciding questions of fact when we state that there is "no evidence" for a fact. This is not the case. What we are concluding is that there is not sufficient evidence to permit the finding of recklessness as a matter of law. *See Jackson v. Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, ¶ 12 (in a case involving review of a trial court's grant of summary judgment, stating "We now review the record to determine whether there is sufficient evidence to permit a finding of actual malice as a matter of law."). As we have said, "[w]hile it is generally inappropriate for a trial court or appellate court to consider either the *weight* of the evidence or the *credibility* of witnesses who provide affidavit or deposition testimony in summary judgment proceedings, there are instances in which a court will have to consider the *sufficiency* of the evidence, at least, 'to some degree.'" (Citation omitted.) (Emphasis sic.) *Taylor v. Taylor-Wilson Dev. Co.*, 12th Dist. Fayette No. CA2012-08-026, 2013-Ohio-1954, ¶ 36. The court must consider whether there is sufficient competent evidence presented by the party opposed to the motion for summary judgment on any issue for which that party bears the burden at trial. *Id.* at ¶ 37. "'Examination of the evidence is necessary to enable the court to determine whether the nonmoving party has met this threshold standard.'" *Id.*, quoting *Kassouf v. Cleveland Magazine City Magazines*, 142 Ohio App.3d 413, 420 (11th Dist.2001).

**{¶ b}** Also, "[a] question of law does not become a question of fact simply because a court must consider facts or evidence." *Wheatley v. Marietta College*, 2016-Ohio-949, 48 N.E.3d 587, ¶ 55 (4th Dist.), citing *Henley v. Youngstown Bd. of Zoning Appeals*, 90 Ohio St.3d 142, 148 (2000); *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 25 ("That facts are involved in the analysis does not make the issue a question of fact deserving of deference to a trial court"); *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 68 (1982) (stating that "simply because resolution of a question of law involves a consideration of the evidence does not mean that the question of law is converted into a question of fact or that a factual issue is raised"); *O'Day v. Webb*, 29 Ohio St.2d 215 (1972), paragraph two of the syllabus ("The fact that a question of law involves a consideration of facts or the evidence, does not turn it into a question of fact or raise a factual issue; nor does that consideration involve the court in weighing the evidence or passing upon its credibility").

6. The dissent consistently frames the recklessness question as whether Noah's Ark's conduct was acceptable, but that is not the correct question. Because the recklessness analysis is subjective, the question is whether Noah's Ark knew that its conduct would increase the risk of drowning and did it anyway. Baldwin has pointed to no evidence regarding such knowledge.

Such is the case here. The standard for showing recklessness is high and, given the facts of this case, we cannot conclude that Noah's Ark's conduct demonstrated willful disregard for the children's safety. Even when the facts are viewed in a light most favorable to Baldwin, the risk of harm posed to Connor while he swam was not an unreasonable one that was substantially greater than the degree of risk associated with negligent conduct.[7] The trial court, therefore, did not err in granting summary judgment for Noah's Ark, as its actions were not reckless as a matter of law. *See Tallarigo*, 2013-Ohio-5496, at ¶ 21 (affirming summary judgment after concluding that the facts and circumstances did not rise to the level of recklessness). The first assignment of error is overruled.

### B. Exclusion of Expert Opinion

{¶ 48} Baldwin's third assignment of error alleges:

> THE TRIAL COURT ERRED IN FAILING TO CONSIDER THE
> EXPERT TESTIMONY OFFERED BY PLAINTIFF-APPELLANT
> WHEN RULING ON MOTIONS FOR SUMMARY JUDGMENT.

{¶ 49} In this assignment of error, Baldwin argues that the trial court erred by excluding the opinion of her expert, Gerald Dworkin, a "professional Aquatics Safety and Water Rescue Consultant."

{¶ 50} According to Dworkin, within 30 seconds it should have been recognized that Connor was drowning and rescue should have taken place. It was Dworkin's opinion that

---

7. The dissent contends that our conclusion here conflicts with the Tenth District's decision in *Kinnison*. In that case, a child drowned in the deep end of a private pool where there was no supervision. Even if we agreed with the dissent's characterization of the facts in *Kinnison* as differing in "insignificant" ways from the facts in this case (which we do not), we cannot agree with the dissent's conclusion that "the analyses [in *Kinnison* and the case before us] are sufficiently similar." *Kinnison* and this case involve different circumstances. That is, *Kinnison* involved a child drowning in the deep end of a pool and the question was whether the defendant's failure to provide any supervision at all in the deep end was reckless; the court specifically noted the depth of the water as factoring into its decision regarding recklessness. *Kinnison*, 2013-Ohio-5715, at ¶ 23. But in this case, a child drowned in the shallow end of a pool under the supervision of at least one lifeguard and the question is whether the defendant was reckless when its staff members left the pool area after the whistle was blown. Furthermore, in *Kinnison*, the Tenth District found that there was evidence that the defendant had a conscious disregard or indifference to a known or obvious risk of swimming. *Id.* There is no such evidence in this case. In any event, even if our analysis conflicts with *Kinnison*, that decision is not controlling in this district.

it took much longer for Connor to be rescued based on the fact that he was in cardiac arrest when he was taken out of the pool. This fact, said Dworkin, indicated that Connor had not been breathing for several minutes. Dworkin, though, was not a medical doctor, and the trial court concluded that Dworkin was not qualified to give medical testimony. Therefore the court concluded that he was not qualified to render the above opinion.

{¶ 51} Baldwin argues that Dworkin was not offering a medical opinion and that, regardless, the precise amount of time that Connor was submerged is not what is important. Rather, according to Baldwin, what is important is that Connor was submerged long enough to have water in his lungs and to go into cardiac arrest.

{¶ 52} Baldwin contends that this evidence shows that Noah's Ark was reckless in its supervision. We held above that Noah's Ark did not consciously disregard a substantial and unjustifiable risk that its conduct would cause a child to nearly drown. Dworkin's opinion, even if it had been admitted by the trial court, would not show otherwise. Therefore, the exclusion of the opinion did not prejudice Baldwin, and her argument fails with regard to Noah's Ark.

{¶ 53} To the extent that Dworkin's opinion is potentially relevant to Connor's rescue by the Walnut Grove lifeguards, this assignment of error is moot, as Baldwin has settled her claim against Walnut Grove.

{¶ 54} The third assignment of error is overruled.

### C. The Exclusion of Journal Entries

{¶ 55} Baldwin's fourth assignment of error alleges:

> THE TRIAL COURT ERRED IN REFUSING TO CONSIDER THE ADMISSIONS MADE BY NOAH'S ARK'S DIRECTOR, STACY DODGE, DESPITE THAT IT WAS TIMELY FILED PURSUANT TO CIV. R. 56(C).

{¶ 56} After Connor's near downing, Stacy Dodge, Noah's Ark's director, wrote a

series of journal entries about the incident. Baldwin contends these journal entries support her claim that Noah's Ark was reckless. The trial court concluded that it could not consider the journal entries because that evidence was untimely filed two days after Baldwin had filed her opposition to Noah's Ark's summary judgment motion. Baldwin contends that the court was simply wrong about the filing dates. Noah's Ark concedes that the trial court erred in finding that the journal entries were untimely filed.

{¶ 57} The trial court nevertheless considered the journal entries in the alternative and concluded that nothing in them showed that Noah's Ark was reckless. In the entries, Dodge wrote that she and her staff members often were not only watching the Noah's Ark children but also the other children in the pool and that, at one point, she had to ask two Noah's Ark staff members who were sitting next to each other to spread out. For the reasons that we explained in our summary-judgment review, we agree with the trial court that the journal entries do not show reckless conduct. The mere fact that two Noah's Ark staff members may have been seated too close to one another alongside the pool did not increase the normal risk of drowning associated with swimming. Also, that Dodge asked those staff members to spread out shows just the opposite of recklessness: it shows that Noah's Ark was concerned with properly supervising the children in the pool. The trial court did not err.

{¶ 58} The fourth assignment of error is overruled.

### III. Conclusion

{¶ 59} What happened to Connor was a tragedy. But we cannot interject hindsight judgment and determine what Noah's Ark should have done. The applicable legal standard in this case is recklessness, and that standard is high. We conclude that there is no indication Noah's Ark knew or had reason to know that there was an unreasonable risk of harm that was substantially greater than the degree of risk associated with negligent

conduct. Even when the evidence is viewed in a light most favorable to Baldwin, there was no genuine issue of material fact regarding whether Noah's Ark's conduct was reckless. Nothing in the record supports finding that "disposition to perversity" that characterizes recklessness. *Ellis v. Greater Cleveland R.T.A.*, 25 N.E.3d 503, 2014-Ohio-5549, ¶ 29 (8th Dist.). Because Noah's Ark's conduct did not rise to the level of recklessness, the law does not provide for a recovery here.

{¶ 60} Having overruled all the assignments of error, the trial court's judgment is affirmed.

HENDRICKSON, P.J., concurs.

PIPER, J., dissents.

**PIPER, J. DISSENTING.**

{¶ 61} I would reverse the trial court's decision in several respects and therefore respectfully dissent from the majority opinion.

{¶ 62} Summary judgment should not have been granted to Noah's Ark because 1) reasonable minds could come to more than one conclusion as to whether Noah's Ark was reckless; 2) appellant's expert opinion should not have been disregarded simply because the expert was not a medical doctor; and 3) the journal entries written about the incident by Noah's Ark's director should not have been excluded as irrelevant and untimely filed. The journal entries *were* timely filed, and their relevance must be considered in favor of the nonmoving party, Connor's mother, appellant herein.

**FIRST ASSIGNMENT OF ERROR**

**I. Attendant Circumstances Alter Ordinary Risk**

{¶ 63} Noah's Ark is a daycare responsible for the care and well-being of children

placed in their custody—acting in loco parentis (in place of parents). Multiple employees (caregivers) were specifically assigned as pool "lookouts" to oversee the aquatic safety of children in their care during a field trip to a pool facility (a separate business entity). Noah's Ark created two classifications of the children they were taking to the pool: those who knew how to swim and those who were not proficient swimmers, called non-swimmers. Those who were being safeguarded as non-swimmers had to stay in the shallow end where extra caregivers constantly monitored the children's safety while in the water. Caregivers responsible for the children's safety in the shallow end were aware that non-swimmers were identifiable because of the orange wristbands they wore. Connor wore an orange wristband and was in the deeper part of the shallow end when the whistle blew that it was time for everyone to exit the water.

{¶ 64} The classifications were reasonable so that Noah's Ark could provide extra assistance for those who were vulnerable when in the water and may need it. The only reasonable inference is that the extra employees were assigned to watch so they could aid any of the younger, non-swimmers, when they might need it. Yet, it was arguably unreasonable and reckless for all the caregivers, in apparent unison, to abruptly stop monitoring the shallow end while Connor, a more vulnerable non-swimmer, struggled to exit the water. He was left behind on his own even though he was in distress.

{¶ 65} Given the reason for their presence (to aid and assist children in the water) a reasonable inference can be made that Connor's struggle in the water was observable if those in charge of watching had been doing so. A fair-minded jury could find the sudden abandonment of safety measures, previously in place, permitted Connor's struggle to continue into a drowning experience. In other words, as the pool became less crowded and as Connor struggled to exit the pool, he should have been observed by those overseeing his safety and render assistance. Under the existing special or attendant circumstances,

he was not.

{¶ 66} Noah's Ark employees were present as caregivers to provide extra protection in preventing the ordinary risk of drowning while at the pool facility. The extra protection was prudent because Noah's Ark had decided to take non-swimmers to the pool to play in the water. Providing the extra protection was clearly a special circumstance due to the known lack of proficiency of some of the children Noah's Ark took to the pool.

{¶ 67} Those, like Connor, with more exposure to the ordinary danger of being in the water would be easily identified, and they would have extra adults monitoring them (than those Noah's Ark provided for the deeper water). This would ensure assistance if needed. However, unforeseen, and without any reason, the protectors-of-safety abruptly withdrew their protection. This became an attendant circumstance wherein a reasonable person could find that the conduct of Noah's Ark, through its caregivers, was not just very dangerous, but also reckless.

{¶ 68} It is undisputed by Noah's Ark that it gave special attention to the children in their charge while in the shallow end. As stated in their brief, "the evidence of record shows that two Noah's Ark teachers were positioned in the pool, while the other staff members were spread out along the edge of the perimeter of the pool, *most* near the shallow end." (Deposition reference omitted.) (Emphasis added.). However, when the facility's break-time whistle was blown, those specially placed guardians-of-safety decided to direct their attention elsewhere. Connor was in the shallow end alone and went through a series of efforts trying to exit the pool.[8]

{¶ 69} Connor's abandonment by his safety overseers resulted in an unforeseeable,

---

8. It is common knowledge children in a pool will swim and play to the point of exhaustion. It is also common knowledge that pool facilities exercise a safety practice requiring everyone to exit the water periodically to rest before resuming water activities.

uncustomary circumstance in which Connor would not receive the aid that otherwise had been put in place. A reasonable person could find such conduct was more than negligence. Designated protectors are not expected to abandon their post allowing a risk of harm to materialize—a risk they had previously neutralized when maintaining their post. Connor was left alone in the water, unmonitored, without assistance from those designated to give it.

{¶ 70} *Most* of the daycare workers (those not actually in the water) were on the pool decking assigned as "lookouts" for the smaller children in the shallow end. Despite having a unique vantage point to observe those still in the water, they turned away from watching Connor as his ordeal unfolded. If they had not done so, they would have seen Connor struggle to reach the ladder "a few times," as described by a facility lifeguard who did not know Connor was a non-swimmer.

{¶ 71} If Connor's caregivers had not decided to behave so indifferently to discontinuing Connor's safety trying to exit the water, they would have seen his initial slip or misguided push-off from the side of the pool, then his attempt at requesting help, his getting splashed in the face, and eventually his inability to reach the ladder several times. If Connor's caregivers had stood fast with their unique assignment, they would have seen him inhale water and then become unconscious causing him to sink below the surface and remain there until rescued by the deep end facility lifeguard (who had already cleared his end of the pool). They would have observed Connor, lifeless, not return to the surface for air.

{¶ 72} I do not find these reasonable inferences to be "speculation" as the majority does. Furthermore my colleagues determine that the guardians-of-safety abruptly abandoning their posts and walking away (while Connor struggled in the water) did nothing to create a risk he would drown alone and unprotected. ¶ 32 above. Such determinations

are factual determinations for a jury.

**{¶ 73}** The majority finds there are no material facts at issue, *id.*, yet fails to consider natural and reasonable inferences. Summary judgment is only appropriate as a matter of law when there is no possibility of competing inferences. *Tucker v. Barret*, 12th Dist. Warren No. CA2010-09-090, 2011-Ohio-2854, ¶ 16, citing *Byrd v. Smith,* 12th Dist. Clermont No. CA2007-08-093, 2008-Ohio-3597, ¶ 35 (The issues only become a matter of law when the material facts are undisputed and no conflicting inferences are possible). All competing inferences in summary judgment proceedings are resolved in favor of the non-moving party.[9]

**{¶ 74}** As Connor attempted to reach the ladder, he struggled to ask some boys ahead of him for help, but the boys did not hear him during their clamor to exit the pool. Tragically, the extra guardians-of-safety from Noah's Ark decided because the pool facility's whistle blew, they could disregard Connor's presence in the water and disengage from facilitating aquatic safety. Connor hung onto the wall, went backwards, tried to get help, inhaled water, became unconscious, and sank below the surface where he remained for a period of time.

**{¶ 75}** The special lookouts providing extra safety oversight consciously determined that assistance to anyone left in the water was no longer their concern and turned their

---

9. My colleagues reconcile the evidence by finding it to be "no evidence" on numerous occasions. For example, there was "no evidence" that Connor's caregivers were insufficiently concerned when they terminated their aquatic safety measures while Connor was still in the water trying to get out. ¶ 34 above. Yet there is certainly a reasonable inference of such. The majority finds there was "no evidence" that withholding the significance of Connor's orange wristband from the lifeguard made a difference in the lifeguard's response to what she observed. ¶ 43 above. Yet there is an inference that had she known about the "non-swimmers," her attention would have been heightened and her response different. Similarly there is "no evidence" as to what Noah's Ark "knew" regarding the risk to Connor in the water without anyone from Noah's Ark being present. ¶ 43 and 45, fn. 6 above. As with many of the majority's findings of "no evidence," one's knowledge (unless confessed) is established by inference drawn from circumstantial evidence. Such determinations are for the finder of fact after hearing all the evidence. The majority defends its findings of "no evidence" suggesting it is only judging the "sufficiency" of the evidence "to some degree". ¶ 45, fn. 5 above. The suggestion implicitly acknowledges the non-moving party's threshold evidence for purposes of summary judgment.

attention to less important matters. The caregivers, instead of responding to Connor, responded to "break time." A reasonable person might find the caregivers became grossly indifferent in discontinuing their willingness to aid a known non-swimmer they had taken to play in the pool. Conner and his parents never foresaw such a circumstance. The decision for everyone to walk away while Connor was struggling in the water could easily be seen as a blatant disregard for Connor's safety.[10]

## II. Information Withheld Compounded the Circumstances

{¶ 76} Connor's mother contends that the sudden withdrawal of monitoring her son's safety to protect him from the ordinary risks of drowning generated a special or attendant circumstance resulting in a different unassumed risk which previously had not existed. Additionally, she contends this circumstance was compounded by an additional special circumstance that the pool facility lifeguards were not informed that the conspicuous orange wristbands meant the child in the water was a non-swimmer requiring extra scrutiny and attention.

{¶ 77} When Connor struggled to exit the pool following the others, the only one actually watching was the pool facility lifeguard at the shallow end. However, she unfortunately had not been informed that Connor's orange wristband identified him as an inexperienced, non-swimmer. Although she "thought" Connor was "swimming," she became concerned because he had trouble reaching the ladder. She noticed Connor had tried to reach the ladder "a few times," but not knowing his status as a non-swimmer, she made no attempt to reach out and assist Connor. She saw Connor "slip," go backwards,

---

10. The third assignment of error becomes significant because the expert's report dealt in part with the length of time Connor was submerged, not breathing, which goes to the degree of disregard or indifference exercised by Connor's caregivers when evaluating whether their conduct was "reckless."

and then he "went under."[11]

**{¶ 78}** The act of withholding important information from the lifeguard (a person guarding life) that children wearing orange wristbands were not proficient at swimming was an additional special circumstance that led to Connor not receiving the assistance he desperately needed. Clearly, non-swimmers are more susceptible to a risk of drowning than those proficient at swimming. However, the lifeguard did not have all of the information required to accurately evaluate what she was observing. This, in turn, significantly hindered her ability to interpret the aquatic emergency unfolding before her. The act of withholding important information from the facility lifeguard became a special circumstance helping to develop the unforeseen risk of drowning due to the absence of lifesaving assistance.

**{¶ 79}** However, the majority declares there is "no evidence" the information designating Connor as a non-swimmer was "relevant." ¶ 30 above. Withholding the information that the orange wristbands designated a need for heightened attention would make the lifeguard's reaction less probable. The majority finds withholding Connor's wristband designation was "no evidence that it contributed to Connor pushing off the wall and swallowing water." *Id.* First, the abbreviated summary of events is inconsistent with the majority's own description, ¶ 8 above, which indicates that after Connor pushed off, he then tried to ask for help but wasn't heard, and then tried to get to the ladder (a few times according to the lifeguard). And secondly, no one argued the wristband designation alone contributed to Connor's drowning experience.

**{¶ 80}** I agree that a child's age is immaterial when considering the application of primary assumption-of-the-risk to routine water activities *under normal circumstances*. Yet

---

11. My colleagues determine there is "no evidence" the pool facility lifeguard would have reacted differently had she known the orange wristband meant Connor was a designated non-swimmer. However, whether such an inference is appropriate should be determined by a jury.

age is not "irrelevant" as the majority suggests, ¶ 29, 30, 35 above, when examining the special or attendant circumstances. Every fact and circumstance unique to an incident contributes to the determination of a special or attendant circumstance.

{¶ 81} The existence of "recklessness" depends upon the weight attributed to the special or attendant circumstances. "Weight" must not be assigned the various facts in summary judgment proceedings. *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 121 (1980). This is why "reckless conduct," almost always is a fact question to be determined by a jury. The absence of reckless conduct herein cannot be concluded as a matter of law.

{¶ 82} The majority relies on *Whalen v. T.J. Automation,* 3d Dist. Henry No. 7-18-27, 2019-Ohio-1279, for "various general principles of law" without appreciating how significant facts affect the application of those principles. ¶ 23, fn. 2 above. When analyzing whether particular facts rise to the level of special or attendant circumstances, the specific facts cannot be ignored. *See Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 432 (1996). In other words, the facts as determined to exist affect how the law is applied.

{¶ 83} *Whalen* determined that when a five-year-old was playing in the shallow water of a lake, liability would not be imposed upon the landowner just because they hosted the event. More to the point, the decision emphasized the parents of the five-year-old were physically present and were the ones with a duty to protect the safety of their child while in the water. *Whalen* at ¶ 35-36. Unlike *Whalen,* Connor's mother does not seek imposition of liability upon Noah's Ark as a landowner. Therefore the principles of law in *Whalen* have no application because they pertain to the parents' duty to watch their child since they took him to, and remained with, their child at the lake.

{¶ 84} Noah's Ark was in loco parentis of Connor and in the profession of monitoring and assisting young children who cannot always care for themselves. Connor's father executed the permission slip indicating Connor was a non-swimmer. The conscious

disregard and indifference displayed by those caring for Connor's safety while still in the pool was unforeseeable and not a risk Connor or his mother could have assumed. The circus tight-rope walker may assume the ordinary risk he could fall and get hurt. But he does not assume a risk that his life-saving safety net below will be cut down by a support crew when he is halfway through his walk just because the ringmaster announces the show is about to end. While foreseeable, customary injury from a particular activity may be assumed as an ordinary risk of injury, injury occurring because of special or attendant circumstances are not assumed.

{¶ 85} The special or attendant circumstances in Connor's pool experience developed a risk of drowning from the absence of an aquatic assistance (which was to remain available). The majority opinion indicates: "We conclude that nothing Noah's Ark did—or failed to do—constituted a special or attendant circumstance." However, such a determination cannot be made without assigning weight and credibility to the facts and inferences drawn therefrom. Likewise, the majority presumes Connor assumed the risk that his caregivers, all at the same time, would suddenly make themselves unavailable to aid him. Respectfully, I disagree such a conclusion is appropriate.

{¶ 86} Noah's Ark provided employees as caregivers who were present as aides to specifically look after and assist Connor, and others like him, eliminating the ordinary risk of injury in the water. While those protecting him were present, he was safe, and aid was imminent if needed. The act of suddenly abandoning Connor's custody, care, and control in a haste to vacate the water because it was break time, equates to a special or attendant circumstance creating a different risk for Connor drowning. The risk not assumed was that no one from Noah's Ark would be present to assist him if he experienced trouble in the water. A reasonable person could find it inconceivable that the people assigned to ensure aquatic safety would suddenly abandon their posts simply because a whistle blew. The

majority opinion negates the legal principle that special or attendant circumstances can affect which risks are assumed.[12]

{¶ 87} The situation would be different if the break-time whistle had not received the response it did from Connor's caregivers. Without their reaction to the break-time whistle, their aquatic safety measures would have continued. Their act of abandonment was akin to prematurely removing Connor's safety net. Similarly the situation may have been avoided if the lifeguard had been informed that Connor's orange wristband meant he required heightened attention. Not knowing the significance of the two categories of children in the water, she did not know Connor was a non-swimmer. There was no reason for Noah's Ark to withhold from the trained lifeguard (stationed in the vicinity of the shallow end) that the orange wristband meant Connor was inexperienced and lacked proficiency in the water.

{¶ 88} Noah's Ark attempts to recast the significance of the different colored wristbands indicating the orange ones only meant that the child should not be swimming in the designated deep end of the pool. However, there would still be no reason for withholding that information from the facility lifeguards. Considering the shallow end lifeguard's observations of Connor, had she known the significance of Connor's orange wristband while being in the deep-water portion of the shallow end, her reaction in aiding may have been prompted.[13] Regardless, the significance of the different colors is disputed,

---

12. My colleagues determine because there is always a risk of drowning in water, the drowning is always an assumed risk. In other words, if all the lifeguards at a pool abandoned their posts because a card game was being commenced in the clubhouse, leaving a child alone in the water, that child's drowning would still be an assumed risk despite the added circumstance as to why lifesaving aid wasn't available.

13. It is true a fact finder cannot make an inference *solely* upon an inference; such is universally condemned. But the same facts may give rise to two or more inferences because each is drawn separately and is not an inference upon an inference. Similarly, parallel inferences are universally acceptable, being an inference based in part upon another inference and in part upon factual support, "provided it is a reasonable conclusion for the jury to deduce." *State v. Ester*, 3d Dist. Van Wert No. 15-89-5, 1990 WL 252213, *15 (Dec. 31, 1990), quoting *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329, 333 (1955).

and such dispute must be resolved in favor of the nonmoving party.

**{¶ 89}** Regrettably, disregarding the significance of the different color designations and being indifferent to sharing the designation of non-swimmer with the facility lifeguards made the wristbands become insignificant and meaningless to the lifeguards. To the facility lifeguards the orange wristbands only meant the children wearing them were from the daycare and being watched by their daycare caregivers.

### III. Reckless Conduct and The Doctrine of Recreational Activity

**{¶ 90}** The majority opinion determines that those in charge of watching the inexperienced children in the shallow end did not recklessly increase Connor's risk of drowning by walking away and leaving Connor alone in the water. Respectfully, I disagree and find this to be an issue best determined by a jury. The attendant circumstances created an unforeseen, and otherwise non-existent, risk of drowning that otherwise would not have occurred. (Fortunately for all involved, six-year-old Connor had a strong heart that eventually responded to resuscitation.)

**{¶ 91}** The majority opinion accepts the trial court's overly broad, general application of assumption of the risk to the doctrine of recreational activity. Six-year-old Connor and his parents never assumed the risk of Connor being completely unobserved and denied aid from Noah's Ark while in distress.

**{¶ 92}** Primary assumption of the risk "is based on the rationale that a participant to a sporting event or recreational activity accepts the risks associated with the sport or activity." *Pope v. Willey*, 12th Dist. Clermont No. CA2004-10-077, 2005-Ohio-4744, ¶ 8. In that case, we agreed the injury occurred during a recreational activity, but appellant had not assumed the risk of the injury in the way that it occurred. *Id.* at ¶ 13-15.

**{¶ 93}** In *Pope*, we examined "whether the injury was a result of a foreseeable and customary part of the activity." *Id.* at ¶ 10, citing *Brown v. Columbus All-Breed Training*

*Club*, 152 Ohio App.3d 537, 2003-Ohio-2057 (10th Dist.). The injury must result from a foreseeable and customary part of the activity because "the limitation on liability applies only to *ordinary* risks *directly* associated with the activity." (Emphasis added.) *Id.* My colleagues determined, however, that because drowning is generally a risk associated with being in a pool, Connor and his parents assumed any and all possible risk of drowning no matter what the circumstances were that led to the incident. Assumption of the risk applied to the recreational activity doctrine does not extinguish special or attendant circumstances that can lead to a risk not ordinarily assumed.

{¶ 94} Facts are not evaluated in a vacuum away from the attendant circumstances. Connor's mother disputes that they accepted a risk of Connor being left alone in the water, unwatched and unassisted when in distress. The conduct of abandoning Connor when in a bad situation may or may not be considered reckless, but such a determination may not be made without weighing the summary judgment materials. My colleagues find there is "no evidence" of an unassumed risk and "no evidence" that the circumstances were unusual. ¶ 34 above. However, most of their analysis on this point relies on cases such as *Salyer*, *Mullens, Whalen,* and *Bole*, ¶ 24 above, which involve the ordinary risks associated with swimming. However, not all drowning incidents are the result of the ordinary risks associated with swimming.

{¶ 95} The risks of injury assumed in recreational activities are those ordinary to the event or activity. In *Aber v. Zurz*, 9th Dist. Summit No. 23876, 2008-Ohio-778, it was determined that the recreational activity of "tubing" had risks of injury. Yet special circumstances altered the risks, such that the risk of injury was no longer a risk considered customary and foreseeable. *Id.* at ¶ 14-15. The *Abner* court relied upon our *Pope* decision, as well as our decision in *Lykins v. Fun Spot Trampolines*, 12th Dist. Clinton No. CA2006-05-018, 2007-Ohio-1800.

{¶ 96} In *Lykins*, we acknowledged the activity of bouncing on a trampoline was a recreational activity and involved inherent risks of injury. However, that did not mean that all injuries that resulted from bouncing on the trampoline arose from the inherent risk assumed. We reaffirmed our decision in *Pope,* that the risks associated with the activity are only those that are foreseeable and customary risks*. Id.* at ¶ 34. We determined the way the trampoline had been varied in its use caused a risk of injury not in the scope of foreseeable and customary risks associated with the intended activity. *Id.* at ¶ 35.

{¶ 97} The special or attendant circumstances creating Connor's situation could easily be seen as providing a risk of drowning that was not foreseeable. The risk of drowning due to caregivers abandoning Connor while in distress was never an assumed risk Connor and his parents associated with the pool event. The fact that abandoning Connor in the circumstances was unforeseeable made it not an ordinary risk generally associated with being in the water.

{¶ 98} There are genuine issues of material facts that remain in dispute to be weighed as to whether special or attendant circumstances existed and whether Noah's Ark exercised "reckless conduct." "Recklessness" involves a conscious disregard or indifference to an obvious risk of harm. *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, paragraph four of the syllabus (adopting Restatement of the Law 2d, Torts, Section 500 [1965]). My colleagues determined that Noah's Ark, as a matter of law, was only negligent, ¶ 47 and 59 above, meaning there was a duty, breach of duty, proximate cause and injury. Yet they hold a jury as a matter of law can only agree with them, depriving consideration of the facts comprising special or attendant circumstances.

{¶ 99} Whether conduct is reckless is almost always a disputable issue involving questions of fact for the jury. *See Burnell v. Dulle*, 169 Ohio App.3d 792, 2006-Ohio-7044, ¶ 22 (12th Dist.) (whether a person acted in a reckless manner is usually a question of fact

for the jury).

> Because of the great impact a ruling in favor of a defendant on primary assumption of the risk grounds carries, a trial court must proceed with caution when contemplating whether primary assumption of the risk completely bars a plaintiff's recovery.

*Konesky v. Wood Cty. Agricultural Soc.,* 6th Dist. Wood No. WD-05-032, 2005-Ohio-7009, ¶ 19, quoting *Gallagher*, 74 Ohio St.3d at 432.

{¶ 100} In *Konesky*, the unforeseen circumstances were such that the risk of being trampled at the racetrack by a runaway horse was not a risk that was assumed. *Konesky* at ¶ 22. As stated by the supreme court in *Gallagher,* "there will be attendant circumstances that raise questions of fact whether an injured party assumed the risk in a particular situation." *Gallagher* at 432. The ordinary risks associated with an activity are assumed unless the actions of the defendant were reckless or intentional. *Marchetti v. Kalish,* 53 Ohio St.3d 95, 100 (1990). Contrary to *Gallagher*, my colleagues determine there is no question of fact to be considered as to whether special or attendant circumstances existed. However, courts have recognized even though there is an ordinary risk of drowning when swimming, special or attendant circumstances can generate a risk of drowning in an incident not assumed.

{¶ 101} In *Kinnison v. Ohio State Univ.*, 10th Dist. Franklin No. 13AP-501, 2013-Ohio-5715, the appeals court reversed a grant of summary judgment and remanded for consideration of whether a 4-H Club's actions rose to the level of being reckless. The Club made no arrangements for pool safety and there was no staff to look out for non-swimmers. While there is ordinarily a risk of drowning, the court determined that when construing the evidence in the light most favorable to the plaintiffs, reasonable minds could find there is a material issue of fact whether the 4-H Club's actions in failing to provide safeguards rose to the level of recklessness. *Id.* at ¶ 23, citing *Thompson v. Bagley,* 3d Dist. Paulding No. 11-

04-12, 2005-Ohio-1921.

**{¶ 102}** While the facts in *Kinnison* differ in insignificant ways, the analyses are sufficiently similar. The majority analysis is in conflict with the reasoning in *Kinnison* and *Gallagher*. Connor's mother alleges in this particular situation, where a risk of drowning existed, the attendant circumstance of Noah's Ark abandoning its aquatic safety measures created an absence of aquatic safety that was not assumed, and therefore constituted reckless conduct. *Gallagher* reasoned that attendant circumstances raise questions of fact whether an injured person assumed the risk in a particular situation. *Gallagher*, 74 Ohio St.3d at 432. *Kinnison* stands for the principle that when there is a risk of drowning for a non-swimmer, the circumstance can raise a question of fact as to whether the absence of aquatic safety measures was reckless conduct.

**{¶ 103}** My colleagues fail to apply the significance of *Gallagher* and *Kinnison*. Their opinion finds factual distinctions regarding the depth of the water where the respective drownings occurred, and by inferring the significance of Walnut Grove's lifeguard in the vicinity of the shallow end. ¶ 47, fn. 7 above. However the record does not suggest the facility lifeguard knew the entire staff from Noah's Ark was abandoning their role as stationed lookouts and were no longer watching children in the water. Additionally, there is no indication that when all ten employees acting as guardians-of-safety decided to place their attention elsewhere (while Connor struggled to exit the water) that they were relying on the one lifeguard to act in their stead. Therefore, determinations in both *Gallagher* and *Kinnison* remain applicable.[14]

---

14. The lifeguard's physical proximity to the shallow end does not absolve the conduct of Noah's Ark in failing to provide the assistance it had implemented a plan to provide. Since Noah's Ark did not share with the lifeguard how Noah's Ark was identifying designated non-swimmers, there is a reasonable inference that the stationed ten employees (around the shallow end) never possessed an intention to rely on the facility lifeguard. Furthermore, even if the majority's inference is reasonable, there are competing inferences which would disfavor the granting of summary judgment.

{¶ 104} My colleagues evaluate the evidence and conclude, "[b]ut Noah's Ark had no obligation to decrease the risk of drowning." ¶ 31 above. However, when taking non-swimmers to a pool and providing aquatic safety measures for lifesaving assistance, a jury might find differently. My colleagues conclude "[t]here is no evidence of an unusual situation or out-of-the-ordinary circumstance." ¶ 34 above. According to *Gallagher*, this is also a fact question. Whether it is reckless conduct for caregivers who were standing by to render aid and assistance to abruptly walk away while a child is in distress is a question of fact to be determined by a jury.

{¶ 105} As in *Pope, Abner, Lykins*, and *Konesky*, assumption of the risk does not apply because the injury to Connor resulted from a risk not customarily assumed when being watched and aided by caregivers. Being injured as the result of Noah's Ark's caregivers abandoning Connor was not the result of a routine or foreseeable risk of injury. A reasonable jury could find the sudden withdrawal of aquatic safety measures designed to eliminate the ordinary risk of danger to an inexperienced young child (when taken by the daycare to a pool to play) was a special or attendant circumstance. The abrupt disregard and indifference displayed for a person in distress could also be considered as more than negligence if special or attendant circumstances were found to exist. The hallways of civil justice offering a day in court must be brightly lit, not dimmed to darkness by summary judgment.

## THIRD ASSIGNMENT OF ERROR

{¶ 106} Connor's mother also complains that the trial court erred in determining her aquatic safety expert was unreliable because he was not a medical doctor. The trial court went to considerable lengths to discredit the expert and relied upon a case from Virginia to exclude portions of his opinions. My colleagues chose a different route. They characterized the report as going to liability aimed at Walnut Grove, a party that reached a settlement and,

with little analysis, determine the merits of the expert's opinions to Connor's case as de minimus so that its exclusion was not prejudice.

{¶ 107} In failing to observe the significance of the expert's report the majority finds, "the precise amount of time that Connor was submerged is not what is important." ¶ 51 above. However, the length of time Connor was unobserved while struggling to get out of the pool, and eventually lifeless beneath the surface, goes directly to the degree of disregard or indifference that supports reckless conduct on the part of Noah's Ark. Connor's caregivers were physically present to protect his safety while he was in the water and they went missing in action. The amount of time Connor was unobserved is important. The significance or degree of importance remains within the province of the jury, not summary judgment proceedings.[15]

{¶ 108} The trial court acknowledged that appellant's expert was an aquatic safety and water rescue consultant for Lifesaving Resources, a company dedicated to drowning and aquatic injury prevention and emergency management. The expert had been involved in the field of aquatic safety, training, and operations for 50 years. The expert had written and published over 40 articles for professional journals. He had trained others in aquatic safety all over the country as well as internationally. He had worked for the Red Cross for 14 years, and on behalf of the Red Cross he trained others in aquatic safety and supervision as well as CPR training. At the time of his deposition, the expert had spent 50 percent of his time training and educating others and the remaining 50 percent rendering opinions for litigation purposes. He has testified in over 77 cases. His education and experience were

_____

15. The majority also opines exclusion of the expert's opinion at the trial court level was not prejudicial because the majority held in their appellate review "that Noah's Ark did not consciously disregard a substantial and justifiable risk." This reasoning places the proverbial cart before the horse. The time that Connor was not assisted after being in distress (the time it took to discover Connor under water prior to his rescue) could affect a jury's opinion as to whether a substantial risk was disregarded. Therefore it was proper consideration *prior to* appellate review.

articulated in his curriculum vitae, which was made part of the record along with his report rendering professional opinions.

{¶ 109} The trial court herein followed a state of Virginia decision that found this expert's testimony regarding CPR was not admissible because such testimony was only within the purview of a medical doctor. The trial court further found the expert's preliminary report was unreliable because there were materials the expert wanted to review that had not been produced at the time of his report. The trial court also stated the expert had not reviewed some of the "actual evidence." However, the degree of preparation in forming opinions goes to the credibility or weight of the opinions, not its admissibility in summary judgment proceedings.

{¶ 110} Despite the expert's qualifications, the trial court stated it "is not considering Plaintiff's expert's testimony and opinion as to whether proper safety and supervision were in place due to the unreliability of that testimony." The trial court also criticized the expert's testimony because he did not opine on the ultimate issue of "recklessness." Much of this reasoning is flawed for various reasons.

{¶ 111} The admissibility of expert testimony must be made on a case-by-case basis. An expert witness gives testimony because they possess special technical knowledge that will assist a trier of fact. "[A]n expert necessarily brings to each case knowledge of facts and data that are not in evidence." *Compher v. The Kroger Company,* 5th Dist. Guernsey No. 04 CA 12, 2005-Ohio-482, ¶ 55. An expert must only demonstrate knowledge on a particular subject which is superior to that of an ordinary person and apply his or her training, education, and experience to the predicate facts already in evidence. *Id.* at ¶ 41, 55.

{¶ 112} Furthermore, an expert witness who is not a physician, but who qualifies under Evid.R. 702, may give testimony relevant to a medical condition if the testimony is

within their expertise. *Shilling v. Mobile Analytical Services, Inc.,* 65 Ohio St.3d 252 (1992), syllabus. In *Schilling,* the expert witness was not a medical doctor but had sufficient training, education, and experience for testimony regarding the physical effects of damage from the ingestion of gasoline upon the brain and nervous system. *Id.* at 255. The lack of being a medical doctor does not make an expert opinion unreliable simply because the specialized knowledge involves human physiology. *Id.*

{¶ 113} Additionally, when Evid. R. 702 was revised, it did permit expert testimony concerning the ultimate issue in question, however, the rule does not require an expert testify as to the ultimate issue. Furthermore, questions of reliability pursuant to Evid.R. 702(C) are to be directed at the technical or specialized knowledge used by an expert in reaching his or her conclusions rather than trying to determine whether the conclusions themselves are reliable. Much of the criticisms levied upon the expert went more to weight and credibility than inadmissibility due to a lack of specialized knowledge. Therefore, I conclude the expert's report was a proper consideration in determining whether summary judgment was appropriate and should not have been excluded.[16]

**FOURTH ASSIGNMENT OF ERROR**

{¶ 114} Connor's mother also complains that the trial court erred in not considering an exhibit submitted for summary judgment purposes. The trial court determined it was filed untimely when in fact it *was* filed timely. The exhibit revealed that employees assigned to watch out for the safety of children in the water were talking to, or socializing with, one

---

16. The majority opinion finds the expert's opinions would not be probative to finding a substantial risk was disregarded and that employees of Noah's Ark caused a drowning experience. ¶ 52 above. However those conclusions require factual reconciliation. Additionally the expert's opinions contributed to other aspects of Connor's claims (such as the degree of disregard and indifference in not observing Connor's distress and the time it took to find him submerged).

another and had to be separated.[17]  The trial court appeared to have strong sentiment that such evidence didn't mean that Conner's caretakers were distracted.

{¶ 115}  The trial court concluded that the employees were "doing their jobs and watching the children."  Yet an equally reasonable inference is that the reason the employees had to be separated was they were indifferent to the safety needs of the children in the water.  The significance of inattentive conduct is a question of fact.

{¶ 116}  The trial court interpreted one of the diary notations to mean "that it was impossible to keep a constant eye on all Noah's Ark children all the time."  However, the time in question was when Connor was struggling to get out of the water and eventually remained submerged before being discovered by the deep end lifeguard.

{¶ 117}  At the time Connor struggled in the water it appears he was the only one in the water or at least one of the last remaining.  The deep end lifeguard had cleared the deep end of the pool and descended from his chair.  The notation was offered to support an inference that the daycare providers were inattentive or indifferent to children in the water whose safety was to be looked after.  Furthermore, the trial court failed to consider the employees were not designated to watch "all" the children and were assigned to watch limited areas.

{¶ 118}  I would find the trial court inadvertently assigned weight and credibility to the notation which resulted in an abuse of discretion excluding the exhibit.

**CONCLUSION**

{¶ 119}  I dissent because the assumption of the risk doctrine applied to the doctrine of recreational activity does not bar claims for any and all injuries that occur when the

---

17. The majority opinion characterizes the incident as if the employees guarding and protecting the children were separated by their supervisor because they were "seated too close."  However, after reviewing the diary notation, there is an equally reasonable inference they were separated because they were distracting each other by socializing with one another instead of attending to the children in the water.

injuries are the result of unforeseen risks of injury not ordinarily assumed when participating in the activity. Connor had no way of foreseeing his aquatic safety would be jeopardized by everyone from Noah's Ark walking away and leaving him in the water with no aid or assistance. If special or attendant circumstances are found to exist, then "reckless conduct" would be appropriately considered. These are genuinely disputed material facts at issue to be decided at trial.

{¶ 120} I also dissent because the trial court abused its discretion in excluding portions of the expert's report and inadvertently assigned weight and credibility to other portions of the expert's opinions. Furthermore, the diary notations were timely filed, and any relevance requires the resolution of inferences which should take place at trial.

{¶ 121} Therefore, I would sustain each of appellant's assignments of error and reverse the trial court's granting of summary judgment and remand for further proceedings.