[Cite as *Marinakis v. Marinakis*, 2025-Ohio-2555.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


EVONNE SKOUTELAS MARINAKIS, : 
et al., 
                                    CASE NO. CA2024-05-070

          Appellees and Cross-Appellants, :

                                              <u>OPINION AND</u>
    - vs -                                 :                      <u>JUDGMENT ENTRY</u>
                                                    7/21/2024

                                                      :

GEORGE D. MARINAKIS, et al., :

          Appellants and Cross-Appellees. :


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
PROBATE DIVISION
Case No. PC22-05-0018


Flagel & Papakirk and James Papakirk; and Robbins, Kelly, Patterson & Tucker, and William D. Sherman and Zachary C. Schaengold, for appellees and cross-appellants.

Schroeder, Maundrell, Barbiere & Powers, and Thomas T. Keating and Kurt M. Irey, for appellants and cross-appellees.


# **O P I N I O N**


**BYRNE, P.J.**

{¶ 1} This case involves a dispute between a deceased man's widow and children, on the one hand, and his siblings, on the other hand, over whether the children

should inherit a portion of the deceased man's estate. Defendants-Appellants/Cross-Appellees, George D. Marinakis, Ted D. Marinakis, and Angela D. Marinakis (collectively, "the siblings"), appeal from the decision of the Butler County Court of Common Pleas, Probate Division, granting summary judgment in favor of Plaintiffs-Appellees/Cross-Appellants, Evonne Skoutelas Marinakis and the three minor "pretermitted" children she shared with her deceased husband. For the reasons outlined below, we reverse the trial court's decision and remand for further proceedings.

## I. "Pretermitted" Children or Heirs

{¶ 2}  This case concerns the legal status of certain "pretermitted" children. This term will be unfamiliar to most readers. In fact, this appears to be the first case in which our court has ever mentioned the term "pretermitted" and the first case in which our court has ever cited R.C. 2107.34(A), the statute concerning pretermitted children that is at the center of the dispute in this case. We therefore pause at the outset to explain what a "pretermitted" child or heir is, and to provide the reader with the statute's text.

{¶ 3}  "Pretermitted" means "to 'pass by,' 'to omit,' 'to disregard.'" *York v. York*, 60 N.E.2d 70, 73 (2d Dist. 1944), quoting *Porter v. Porter's Ex'r*, 120 Ky. 302 (1905). The pretermitted-child statute, R.C. 2107.34(A), states that a "pretermitted child or heir" exists "if, *after making a will*, a testator has a child born alive, adopts a child, or designates an heir . . ., or if a child or designated heir who is absent and reported to be dead proves to be alive." (Emphasis added.) *See also Maharg v. Maharg*, 1998 Ohio App. LEXIS 4012, *1 (5th Dist. Aug. 3, 1998).

{¶ 4}  With certain qualifications, R.C. 2107.34(A) permits pretermitted children to inherit the portion of their deceased parent's estate that they would have inherited if their parent had died intestate—that is, without a will—through a procedure of proportional "abatement" of the "devises and legacies granted by the will." The statute states in full:

Subject to division (C) of this section,[1] if, after making a will, a testator has a child born alive, adopts a child, or designates an heir in the manner provided by section 2105.15 of the Revised Code, or if a child or designated heir who is absent and reported to be dead proves to be alive, and no provision has been made in the will or by settlement for the pretermitted child or heir, or for that child's or heir's issue, the will shall not be revoked. Unless it appears by the will that it was the intention of the testator to disinherit the pretermitted child or heir, the devises and legacies granted by the will, except those to a surviving spouse, shall be abated proportionately, or in any other manner that is necessary to give effect to the intention of the testator as shown by the will, so that the pretermitted child or heir will receive a share equal to that which the person would have been entitled to receive out of the estate if the testator had died intestate with no surviving spouse, owning only that portion of the testator's estate not devised or bequeathed to or for the use and benefit of a surviving spouse. If the pretermitted child or heir dies prior to the death of the testator, the issue of the deceased child or heir shall receive the share the parent would have received if living.

R.C. 2107.34(A). We will return to the text of the statute in our analysis below, after addressing the facts and procedural history of this case.

## II. Factual and Procedural Background

{¶ 5} This case arises from the untimely death of Bill D. Marinakis on September 9, 2021, due to complications from COVID-19. The dispute centers on the distribution of Bill's substantial estate and whether his children qualify as pretermitted heirs under Ohio law.

{¶ 6} In early 2009, Bill consulted attorney Jetta Mencer about preparing his will. Mencer testified in her deposition that during their three or four meetings, Bill discussed his upcoming marriage to Evonne and expressed some unspecified "trepidation" about the relationship. Mencer said that she advised Bill about a spouse's statutory right to elect against a will and explained how he might use non-testamentary transfers, such as

---

1. Subsection (C) is not relevant to the issues in this appeal.

transfer-on-death accounts and beneficiary designations, to exercise greater control over his assets. According to Mencer, while Bill considered the implications of *marriage* on his estate plan, he did not discuss potential *future children* during these consultations.

{¶ 7}   On May 2, 2009, approximately six weeks before his marriage, Bill executed a will leaving his entire estate to his three siblings—George, Ted, and Angela—except for nominal bequests to his church and dental school. Bill named Angela, a long-time attorney, as the executor of his estate. The will made no mention of Bill's future wife or potential children.

{¶ 8}   Bill married Evonne the next month, in June 2009. Following their marriage, the couple had three children together. The children were born in 2010, 2013, and 2020. Despite these significant life changes, Bill never amended his will.

{¶ 9}   Angela, Bill's sister, testified in her deposition about Bill's approach to financial matters over the years. According to Angela, Bill was meticulous about estate planning, regularly discussing financial matters with her and encouraging their other siblings to maintain current wills. She described Bill as taking deliberate steps to manage and protect his assets, including having financial statements sent to their mother's house, ostensibly to keep them from Evonne's view. Angela recalled conversations with Bill about appropriate inheritance amounts, during which they both expressed their belief that children should not receive so much inheritance that they do not need to work, and that it was important for children to work and have goals. In one conversation approximately seven to eight years before his death, Bill suggested to Angela that his children would be "set for life" and mentioned possibly giving some money to Angela and his brothers.

{¶ 10} But text messages between Bill and Angela during Bill's final illness paint a somewhat different picture. These communications suggest some uncertainty on Bill's part about how his assets would be divided, with Bill appearing to agree with Angela's

message to him that she would "make sure your kids get everything"—a sentiment that seems to conflict with his unchanged will leaving everything to his siblings.

{¶ 11} Angela knew that Bill had substantial assets, but she did not know exactly how much. When he died, it was discovered that Bill owned assets totaling around $10 million. His probate estate, which included bank accounts, stocks, investment accounts, and business interests, was valued at approximately $5.3 million. Bill's non-testamentary assets, which were in the form of life insurance and various investment accounts, were valued at about $4.5 million. Angela was the beneficiary of the life insurance, and his Siblings were the beneficiaries of some investment accounts. But the bulk of the non-testamentary accounts, around $3.5 million, was designated for Bill's children through various beneficiary arrangements. Bill had also established and funded investment accounts in each child's name; those accounts totaled over $750,000.

{¶ 12} Following Bill's death, Evonne filed an election to take her spousal share against his will under R.C. 2106.01(A), in the amount of one-third of the net estate. Evonne then initiated this action on behalf of the children seeking a declaratory judgment that the children were pretermitted heirs entitled, under R.C. 2107.34, to receive what they would have received had Bill died without a will under R.C. 2105.06(A). This would have amounted to the rest of Bill's estate. Evonne also sought an order placing the estate's assets to which the children were entitled as pretermitted heirs in a constructive trust until the matter was resolved. The siblings counterclaimed, arguing that the substantial non-testamentary assets that Bill left to the children constituted a provision by "settlement," which would mean that R.C. 2107.34 did not apply and the children were not eligible to take against the estate.

{¶ 13} The siblings moved for summary judgment on all the claims and issues, and Evonne and the children moved for partial summary judgment on the siblings'

counterclaim and Evonne's and the children's claim for declaratory judgment. On April 30, 2024, the trial court granted Evonne and the children's motion for partial summary judgment and denied the siblings' motion for summary judgment, finding that the children were pretermitted heirs entitled under R.C. 2107.34 to inherit from Bill's estate.

{¶ 14} The probate court began its analysis by examining the legislative history of a different statute, R.C. 2107.33. It noted that the statute's 1976 amendment eliminated the common-law doctrine of implied revocation, which had treated wills as revoked by subsequent events like the birth of a child (that is, a "pretermitted" child). After finding that Bill's will therefore remained valid despite his children's births, the court turned to R.C. 2107.34, the pretermitted heir statute.

{¶ 15} The probate court interpreted the "no provision" clause in R.C. 2107.34(A) to mean that a valid "settlement" would prevent pretermitted children from taking against the will. It held that establishing that such a settlement exists requires proof that the testator intended the provision to substitute for, rather than supplement, inheritance through the will. When evaluating whether Bill had created a settlement through his non-testamentary transfers, the court found that the evidence—particularly Bill's text messages—supported two "plausible" interpretations. But then, rather than applying the Civ.R. 56 summary judgment standard to this dispute, the court reasoned that R.C. 2107.34 is a remedial statute warranting broad construction. It announced that "substantial doubts about the existence of a settlement should be resolved in favor of inheritance by the decedent's children," particularly given the absence of evidence that the children had "incur[red] the decedent's disfavor" or had a "strained relationship" with Bill. Based on this analysis, the court concluded that the siblings had not produced sufficient evidence that Bill intended his non-testamentary transfers to serve as a settlement in lieu of inheritance. It therefore declared the children to be pretermitted heirs

whose shares would proportionally reduce the siblings' inheritance.

{¶ 16} The probate court ordered that each child take their intestate share of Bill's estate. And the court expressly determined that there was no just reason for delay. *See* Civ.R. 54(B).

{¶ 17} The siblings appealed, and Evonne and the children cross-appealed.

### III. Analysis

### A.  The Siblings' Appeal

{¶ 18} The siblings present a single assignment of error:

> THE TRIAL COURT ERRED IN FAILING TO FOLLOW OHIO CIVIL RULE 56 AND ERRED IN ITS INTERPRETATION AND APPLICATION OF REVISED CODE 2107.34.

{¶ 19} The siblings argue that the trial court erroneously granted summary judgment to Evonne and the children by (1) misinterpreting R.C. 2107.34(A) and (2) failing to follow the requirements of Civ.R. 56 when it ignored genuine issues of material fact and improperly weighed evidence. Central to their argument is the assertion that Bill's substantial non-testamentary transfers to the children constituted a "settlement" under R.C. 2107.34(A), thereby precluding the children from claiming pretermitted-heir status and preventing abatement of the will in their favor.

### 1. The Statutory Framework

{¶ 20} Our analysis begins, as it must, with the text of the pertinent statutory provision, R.C. 2107.34(A). *State v. Pendergrass*, 2020-Ohio-3335, ¶ 5 ("In interpreting a statute, we begin with the statutory language."). The statute's relevant language provides:

> **[First Sentence]** [I]f, after making a will, a testator has a child born alive . . ., and no provision has been made in the will or by settlement for the pretermitted child . . ., or for that child's . . . issue, the will shall not be revoked. **[Second Sentence]** Unless it appears by the will that it was the intention of the

testator to disinherit the pretermitted child . . ., the devises and legacies granted by the will, except those to a surviving spouse, shall be abated proportionately, or in any other manner that is necessary to give effect to the intention of the testator as shown by the will, so that the pretermitted child . . . will receive a share equal to that which the person would have been entitled to receive out of the estate if the testator had died intestate with no surviving spouse, owning only that portion of the testator's estate not devised or bequeathed to or for the use and benefit of a surviving spouse . . . .

R.C. 2107.34(A).

{¶ 21} The statute operates through two interconnected sentences that establish a framework for addressing pretermitted children. The first sentence establishes that when a testator has a child born after making a will, and "**no provision has been made in the will** or **by settlement for the pretermitted child**," the will remains valid despite the birth. (Emphasis added.) *Id.*[2] This preserves the testator's testamentary intent while acknowledging the changed circumstances.

{¶ 22} But the first sentence does not stand alone. The second sentence creates the operative mechanism: it mandates that "the" pretermitted child referenced in the first sentence (specifically, one for whom "no provision has been made in the will or by settlement") shall inherit through proportional abatement of the will's devises and legacies. *Id.* This inheritance right is subject to an exception: no abatement occurs if the will demonstrates "the intention of the testator to disinherit the pretermitted child." *Id*.

{¶ 23} The parties agree that Bill's will contains no language expressing an intent to disinherit the children. Indeed, the will does not refer to the children at all. Therefore, the issue before the probate court was whether Bill made a "provision . . . by settlement" in favor of the children. If such a provision exists, the children fall outside the statute's

---

2. As the trial court noted, this language preventing automatic revocation of a will is an artifact of previous law, under which a will was automatically revoked when there was a pretermitted child.

protection as pretermitted heirs described in the first sentence, and the abatement procedure in the second sentence cannot apply.

{¶ 24} The interpretive question reveals the fundamental dispute between the parties. The siblings contend that R.C. 2107.34(A) requires only an objective determination of whether a settlement exists, without regard to the testator's subjective intent regarding that settlement. They argue that the statute contains no language requiring proof of the testator's intent with respect to either the existence of a "settlement" or its form and quantity. Under their interpretation, the substantial non-testamentary assets Bill provided to the children constitute a settlement that automatically precludes their pretermitted-heir status, regardless of Bill's motivations or intentions.

{¶ 25} Evonne and the children advance a different interpretation. They argue that R.C. 2107.34(A) requires proof of the testator's intent to disinherit after-born children before those children lose their pretermitted-heir protections. According to their reading, this intent requirement applies not only to provisions within the will itself but also to any alleged "settlement" arrangements. Under this theory, Bill's financial arrangements, however substantial in monetary terms, do not demonstrate the requisite intent to exclude the children from inheritance under his will and therefore cannot preclude their pretermitted-heir status.

{¶ 26} We now turn to these disputed questions of textual interpretation.

**2. The Elements of "provision . . . by settlement"**

{¶ 27} Both the trial court and the parties on appeal have focused their analysis on the term "settlement" in the first sentence of R.C. 2107.34(A). While this focus is understandable, a complete interpretation requires examining the full statutory phrase: "provision . . . by settlement."

{¶ 28} R.C. 2107.34(A) does not define "settlement," let alone a "provision . . . by

settlement." When a statute does not define terms, "we afford the terms their plain, everyday meanings, looking to how such words are ordinarily used. This work includes reading words in their context and construing them 'according to the rules of grammar and common usage.'" (Citation omitted.) *State ex rel. More Bratenahl v. Bratenahl*, 2019-Ohio-3233, ¶ 12, quoting R.C. 1.42; *see also State v. Creech*, 2024-Ohio-5245, ¶ 98.

{¶ 29} "Our duty in construing a statute is to determine and give effect to the intent of the General Assembly as expressed in the language it enacted." (Citations omitted.) *Pelletier v. Campbell*, 2018-Ohio-2121, ¶ 14. *See also Caldwell v. Whirlpool Corp.*, 2024-Ohio-1625, ¶ 13 (stating that "'[t]he question is not what did the general assembly intend to enact, but what is the meaning of that which it did enact'"), quoting *Slingluff v. Weaver*, 66 Ohio St. 621 (1902), paragraph two of the syllabus. "In other words, in construing the words of a statute we are to determine the original public meaning of the actual words the General Assembly enacted and apply that meaning." *State ex rel. Moore v. Fornshell*, 2025-Ohio-65, ¶ 14, citing *Pelletier* at ¶ 14, and *Caldwell* at ¶ 13. *See also State v. Howe*, 2024-Ohio-5143, ¶ 31, fn. 3 (12th Dist.).

{¶ 30} The phrase "provision . . . by settlement" in Ohio's pretermitted-child statute has a long history. Section 40 of the "Act Relating to Wills" passed in 1840 appears to have been the first version of the pretermitted heir statute referring to a "provision . . . by settlement." That act provided that if a testator had a will and a pretermitted child not mentioned in the will, then:

> such will shall be deemed revoked, unless *provision* shall have been made for such child *by some settlement*, or unless such child shall have been provided for in the will, or in such way mentioned therein as to show an intention not to make such provision, and no other evidence to rebut the presumption of such revocation shall be received."

(Emphasis added.) *Ash v. Ash*, 9 Ohio St. 383, 384 (1859).

{¶ 31} Legal dictionaries published around the time the phrase "provision . . . by settlement" entered the pretermitted child statute in 1840, illuminate the original meaning of "settlement." An 1860 legal dictionary defined "settlement" as "[a] disposition of property by deed, usually through the medium of a trustee, and for the benefit of a wife, children or other relations." 2 Alexander M. Burrill, *Law Dictionary and Glossary* (2d Ed. 1860). Similarly, an 1876 legal dictionary defined it as "The conveyance of an estate for the benefit of some person or persons." 2 John Bouvier, *A Law Dictionary* (14th Ed. 1876). And an 1883 legal dictionary defined "settlement" as "an instrument by which property, or the enjoyment of property, is limited to several persons in succession . . . [and] implies a deed or an instrument equivalent to a deed." 2 Rapalje & Lawrence, *Dictionary of American and English Law* (1883). None of these historical definitions contain any language suggesting that a "settlement" implies any intent on the part of the testator who made the "settlement."

{¶ 32} There is little to no case law on the meaning of "settlement" as used in the pretermitted heir statute (in any of the forms it took) during most of the 1800s. But in 1889, the Supreme Court of Ohio provided guidance in *Rhodes v. Weldy*, 46 Ohio St. 234 (1889). In that case, the Supreme Court explained in dicta that a "settlement" "certainly implies, if not a sufficient, at least a substantial, present means of maintaining the child." *Id.* at 242. The Court elaborated that a settlement typically involves "the intervention of trustees upon whom is conferred a fund or property in some form which constitutes a source of maintenance, education, etc." *Id*. This definition is generally consistent with the above-quoted legal-dictionary definitions and notably, like those definitions, contains no reference to testamentary intent.

{¶ 33} The General Assembly subsequently relocated the pretermitted heir statute, with minimal changes, first to R.S. 5959 and later to G.C. 10561. In 1932, the provision

underwent another relocation to G.C. 10504-49 and was significantly revised. The revised language was substantively identical to the current R.C. 2107.34(A), to which the provision was eventually transferred, differing only in minor and non-substantive word choices that do not affect this appeal. At the time that the revisions were made, the definition of "settlement" continued to focus on the act, not intent: "The act of settling property upon a person or persons; the particular terms of such an arrangement; the deed or instrument by which it is effected." 9 *The Oxford English Dictionary* (1933) (definition of "settlement" in law).

{¶ 34} In 1940, just a few years after this significant revision, the Franklin County Court of Common Pleas decided *City Natl. Bank v. Kelly*, Franklin C.P. No. 81587, 1940 Ohio Misc. LEXIS 458 (Oct. 8, 1940), analyzing G.C. 10504-49. The common pleas court defined "settlement" as "a provision made extraneous to the will for the benefit of an after-born or after adopted child, with the intention on the part of the settlor that such provision shall preclude the child from taking any other portion of the testator's estate at the time of his [the testator's] death." *Id.* at *16. The *Kelly* definition appears to be the first time in the century since "settlement" entered Ohio's pretermitted-heir statute that a court or any other authority injected an intent-to-disinherit requirement into the definition of "settlement." Notably, the common pleas court cited no Ohio authority to support this definition. Instead, the *Kelly* court relied primarily on the decisions of courts in other states interpreting their own pretermitted-heir statutes and did not focus on Ohio's statutory scheme. *Id.* at *20-31. The absence of supporting Ohio precedent and the definition's inconsistency with historical understanding significantly undermines *Kelly*'s persuasive value.

{¶ 35} Based on our examination of the statutory text, historical dictionary definitions, and limited case precedent, we conclude that "settlement" as used in R.C.

2107.34(A) does not include or imply any particular intent on the part of the testator. Three factors compel this conclusion. First, the statutory text contains no explicit intent requirement. When the General Assembly intends to impose an intent standard, it knows how to do so clearly, as demonstrated by the statute's explicit reference to "the intention of the testator to disinherit the pretermitted child" in the second sentence. Second, historical dictionary definitions consistently describe "settlement" in objective, mechanical terms without reference to subjective intent regarding disinheritance. Third, no controlling Ohio precedent establishes that "settlement" implies a testator's intent to disinherit. Courts may not insert language into statutes that the General Assembly did not include. *State ex rel. Carna v. Teays Valley Local School Dist. Bd. of Edn.*, 2012-Ohio-1484, ¶ 18 (stating that the Court "must . . . abstain from inserting words where words were not placed by the General Assembly"). To read a disinheritance-intent requirement into "settlement" would be to do just that.

{¶ 36} But that is not the end of our analysis. The trial court and the parties have focused too narrowly on the single word "settlement" while overlooking the complete statutory phrase in which that word is found: "*no provision has been made in the will or by settlement.*" (Emphasis added.). When viewed holistically, it becomes clear that we must determine the meaning of not only "settlement" but also "provision" and the relationship between these terms. That is, the statute refers to a "provision . . . made in the will" and to a "provision . . . by settlement," with the same, single instance of the word "provision" applying both to "will" and "settlement." The grammatical structure strongly suggests that "provision" carries the same meaning in both contexts. So, what is a "provision?" And what is a "provision . . . by settlement?"

{¶ 37} We can be certain that the phrase "provision . . . in the will" in the first sentence of R.C. 2107.34(A) does *not* include an intent-to-disinherit element. This is the

case because if it did include that element, the phrase in the second sentence "[u]nless it appears by the will that it was the intention of the testator to disinherit the pretermitted child" would be rendered superfluous. *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, § 26 (2012) (surplusage canon provides that interpretations that render the text of statutes superfluous are to be avoided).

{¶ 38} The statute's structure suggests that the General Assembly distinguished between two concepts: (1) the objective question of whether a provision exists, and (2) the subjective question of whether the testator intended to disinherit. Again, if "provision . . . in the will" automatically implied disinheritance intent, there would be no need for the second sentence's explicit intent inquiry. Because the same instance of "provision" applies to both "will" and "settlement," it logically follows that "provision . . . by settlement" also does not require proof of disinheritance intent. This interpretation preserves the statute's internal consistency and respects the anti-surplusage principle.

{¶ 39} But our analysis in the above two paragraphs establishes only that "provision" does not require intent to disinherit as an element. This still leaves open the question of what "provision" and "provision . . . by settlement" mean.

{¶ 40} To find the answer, we again turn to historical dictionaries that reveal the meaning of "provision" at the time it entered the pretermitted heir statute. An 1839 legal dictionary noted that "provision" arose out of French law and defined the term as follows: "An allowance granted by a judge to a party for his support; which is to be paid before there is a definitive judgment. In a civil case, for example, it is an allowance made to a wife who is separated from her husband." 2 John Bouvier, *A Law Dictionary* (1839). An 1843 edition of the same legal dictionary retained this definition, but also defined "provision" as "the property which a drawer of a bill of exchange places in the hands of a drawee; as, for example, by remittances, or when the drawee is indebted to the drawer

when the bill becomes due, provision is said to have been made." 2 John Bouvier, *A Law Dictionary* (2d Ed. 1843). An 1891 law dictionary contains similar definitions. Henry Campbell Black, *A Dictionary of Law* (1891). These *legal* definitions of "provision" from the relevant time period often reference specific procedural contexts that do not align precisely with the pretermitted heir statute's usage of "provision."

{¶ 41} Contemporary *general* dictionaries, however, provide more applicable guidance. For example, an 1828 dictionary pertinently defined "provision" as "[t]he act of providing or making previous preparation," "[t]hings provided; preparation; measures taken beforehand," and "terms or agreement made, or measures taken for a future exigency." 2 Noah Webster, *An American Dictionary of the English Language* (1828). And an 1841 dictionary defined "provision" as "[t]he act of providing beforehand," "[m]easures taken beforehand," and "care taken." *Johnson's English Dictionary* (1841). Likewise, an 1847 dictionary defined "provision" as the "[a]ct of providing; thing provided; terms settled; care taken; measures taken beforehand." Joseph E. Worcester, *A Universal and Critical Dictionary of the English Language* (1847). The 1933 Oxford English Dictionary defines "provision" generally as "a foreseeing, forethought, precaution, providing, prevention." The specific meanings most applicable here are, "The action of providing; seeing to things beforehand; preparing, or arranging in advance; the fact or condition of being prepared or made ready beforehand" and "Something provided, prepared, or arranged in advance; measures taken beforehand; a preparation, a previous arrangement; a measure provided to meet a need; a precaution." 8 *The Oxford English Dictionary* (1933).

{¶ 42} The common thread linking most of these definitions of "provision" is the concept of "providing," that is, taking affirmative steps to care for someone's future needs. The root verb "provide" was defined in 1828 as "[t]o procure supplies or means of defense; or to take measures for counteracting or escaping an evil," "[t]o furnish; to supply," and

"[t]o procure beforehand." 2 Noah Webster, *An American Dictionary of the English Language* (1828). An 1841 dictionary likewise defines "provide" as "to get ready; to prepare," "[t]o furnish; to supply," and "[t]o treasure up for some future occasion." *Johnson's English Dictionary* (1841). Similar definitions are found in an 1849 dictionary, Joeseph E. Worchester, *A Universal and Critical Dictionary of the English Language* (1849), and the 1933 Oxford English Dictionary, 8 *The Oxford English Dictionary* (1933) ("to make provision *for* a person, his needs, etc."). This idea of preparing in advance, of gathering up for some future occasion, is seen also in the concepts of "care taken," "taken care of," and "preparation." Which suggests that "provision" in the 1840 pretermitted-heir statute referred to taking steps to care for someone.

{¶ 43} While none of the definitions we have cited *explicitly* state that "provision" has an intent element, they *do* reveal that "provision" in R.C. 2107.34(A) refers to taking meaningful steps to care for another person's future welfare. This concept translates readily to both testamentary and non-testamentary contexts. A "provision . . . in the will" occurs when a testator includes a child in the will's distribution scheme, effectively "taking care" of the child after the testator's death. Similarly, a "provision . . . by settlement" occurs when a testator creates non-testamentary arrangements that meaningfully address a child's future financial security.

{¶ 44} But a "provision . . . by settlement" requires more than isolated financial transfers. The historical understanding of "settlement" as involving substantial arrangements for a person's maintenance suggests that not every financial benefit constitutes a qualifying provision. So, for example, a single life insurance policy or investment account, standing alone, may or may not rise to the level of a "provision . . . by settlement" that would preclude pretermitted-heir status. Whether such a life insurance policy or investment account constitutes a "provision . . . by settlement" depends on the

totality of the circumstances.

{¶ 45} To summarize, we conclude that R.C. 2107.34(A) operates through the following framework. First, when a testator fails to provide for a pretermitted child through either testamentary provisions or non-testamentary settlements (that is, some non-testamentary financial, property, or other arrangement), the will remains valid but becomes subject to potential abatement (first sentence). Second, such unprovided-for children inherit through proportional abatement unless the will demonstrates an affirmative intent to disinherit them (second sentence). Third, the determination of whether a "provision . . . by settlement" exists focuses on whether the testator's non-testamentary arrangements meaningfully address the child's future financial welfare, not on whether the testator subjectively intended to exclude the child from testamentary inheritance. But while proof of the testator's subjective intent to disinherit is not a required element of this analysis, evidence of the testator's intent regarding the purpose and scope of non-testamentary arrangements may be relevant to determining whether those arrangements meaningfully address the child's future welfare under the totality of the circumstances. The key is whether a financial transfer constitutes meaningful provision for the child's future care under the totality of the circumstances, not merely that a financial benefit was provided. The dollar amount of the financial transfer is relevant but not determinative, and must be evaluated in light of the totality of the circumstances, including the testator's relative wealth.

{¶ 46} While we acknowledge that R.C. 2107.34(A) reflects the drafting conventions of the mid-1800s and could benefit from legislative clarification, its meaning can be determined through careful textual analysis rooted in historical understanding and established interpretive principles. Should our interpretation prove problematic in practice, the General Assembly retains the authority to update and clarify the statute's

language.

### 3. Genuine Issues of Material Fact Remain

{¶ 47} Having established the proper interpretation of R.C. 2107.34(A), we now turn to whether the trial court correctly applied summary judgment standards to the undisputed material facts. For the reasons discussed below, we conclude that it did not, that genuine issues of material fact precluded summary judgment, and that the trial court erred in granting Evonne and the children's motion.

{¶ 48} Our interpretation of R.C. 2107.34(A) establishes that determining whether a "provision . . . by settlement" exists under the statute requires an objective inquiry focused on whether the testator's non-testamentary arrangements meaningfully address the child's future financial welfare. This determination does not require proof that the testator subjectively intended to disinherit the children or to substitute these arrangements for testamentary inheritance. Although the testator's subjective intent to disinherit is not a prerequisite, evidence bearing on the testator's understanding of the arrangements' purpose and adequacy may inform the objective determination of whether the transfers constitute meaningful provision for the child's welfare. The party opposing pretermitted-heir status must demonstrate that the financial transfers constitute meaningful provision for the child's future care, specifically the type of substantial, systematic arrangements for maintenance that the historical understanding of "settlement" contemplated. This analysis must be conducted in light of the totality of the circumstances.

{¶ 49} This objective standard differs significantly from an intent-based analysis. The question is not whether Bill intended his non-testamentary transfers to serve as a settlement in lieu of inheritance, but whether these transfers, viewed objectively, constitute the comprehensive provision for the children's welfare that R.C. 2107.34(A) contemplates. This does not mean that evidence of Bill's intent is irrelevant to the

analysis. Rather, such evidence may illuminate whether his arrangements objectively constitute comprehensive provision for his children's future needs, without requiring proof that he subjectively intended to substitute these arrangements for testamentary inheritance.

{¶ 50} Under Civ.R. 56(C), summary judgment is appropriate only when "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Baldwin v. Church of God of Trenton*, 2024-Ohio-1726, ¶ 19 (12th Dist.). We review the trial court's summary judgment decision de novo. *Id*.

{¶ 51} The central factual question is whether Bill's non-testamentary arrangements for the children constitute "provision . . . by settlement" under our interpretation of the statute. The record establishes several undisputed facts relevant to the "provision . . . by settlement" analysis. For example, Bill designated his children as beneficiaries of investment accounts totaling approximately $3.5 million. He established and funded individual investment accounts in each child's name totaling over $750,000. These arrangements ensure that each child will receive well over $1 million from non-testamentary sources, whether or not they receive an inheritance through the will-abatement procedure under R.C. 2107.34(A). The total value of Bill's estate was approximately $10 million, with roughly $5.3 million in probate assets and $4.5 million in non-testamentary assets.

{¶ 52} Although these facts about the value and existence of Bill's financial arrangements are undisputed, genuine issues of material fact remain regarding whether

these arrangements constitute "provision . . . by settlement" under the standard established by our interpretation of the statute.

{¶ 53} The statute's requirement of "provision . . . by settlement" contemplates a substantial arrangement for a person's maintenance, not merely isolated financial transfers. *See Rhodes*, 46 Ohio St. at 242 (explaining that settlement "certainly implies, if not a sufficient, at least a substantial, present means of maintaining the child" and typically involves "the intervention of trustees upon whom is conferred a fund or property in some form which constitutes a source of maintenance, education, etc."). Factual disputes exist regarding whether Bill's financial arrangements created comprehensive provision for his children's long-term welfare or represented discrete financial benefits that fall short of the arrangements the statute requires. While the monetary value is substantial, questions remain about whether the structure and nature of these transfers align with the historical understanding of "settlement" as comprehensive provision for maintenance and support. The determination of whether transfers constitute meaningful provision for a child's future welfare necessarily depends on contextual factors, including the size of the overall estate and the family's circumstances.

{¶ 54} While each of Bill's children will receive over $1 million from non-testamentary sources, genuine factual questions exist about whether this provision is meaningful or substantial in the context of Bill's $10 million estate and whether it represents the type of comprehensive care for the children's future that the statute contemplates. This analysis cannot be resolved on summary judgment because it requires weighing the relative significance of the transfers against the total estate, the children's anticipated needs, and the overall family financial circumstances. Evidence of Bill's statements or conduct regarding the purpose and adequacy of these transfers may be relevant to this determination, not as proof of an intent to disinherit, but as evidence

bearing on whether the arrangements objectively provided meaningful care for the children's future welfare. These determinations involve the type of factual assessments that preclude summary adjudication.

{¶ 55} Factual disputes also exist regarding the specific structure, timing, and legal characteristics of Bill's various transfers to the children. Some arrangements appear to have been revocable, raising questions about whether they provided the stable, ongoing provision that settlement arrangements historically entailed. The distinction between gifts inter vivos and settlement arrangements may depend on factual determinations about the legal structure and permanence of Bill's transfers to the children. These structural questions bear directly on whether Bill's arrangements constitute the type of comprehensive, forward-looking provision that distinguishes a "provision . . . by settlement" from other forms of financial benefit. The resolution of these questions requires factual development that summary judgment cannot provide.

{¶ 56} The trial court's analysis further demonstrates precisely why summary judgment was inappropriate in this case. The court acknowledged that the evidence supported "plausible" alternative interpretations, thereby conceding the existence of genuine factual disputes. *See Baldwin*, 2024-Ohio-1726, at ¶ 19. Yet rather than recognizing that such disputes precluded summary judgment, the court improperly resolved these ambiguities by applying what it characterized as a presumption favoring inheritance by the children. This approach violated fundamental summary judgment principles by weighing evidence rather than determining whether genuine factual disputes existed. When a court acknowledges that reasonable minds could reach different conclusions based on the evidence, it has identified precisely the type of dispute that precludes summary adjudication. The court's subsequent resolution of this dispute through application of presumptions constituted an improper exercise of fact-finding

authority.

{¶ 57} The court resolved factual ambiguities against the siblings rather than viewing the evidence in their favor as Civ.R. 56(C) requires. By applying a policy-based presumption to decide disputed questions, the court effectively decided the case on the merits rather than adhering to the constraints of summary judgment procedure. This approach inverted the proper analysis, which requires viewing disputed evidence in the light most favorable to the non-moving party.

{¶ 58} The court's reliance on R.C. 2107.34's "remedial nature" as a basis for resolving factual disputes reflects a fundamental misunderstanding of the relationship between legal interpretation and factual determination. While statutory construction principles inform the legal meaning of R.C. 2107.34(A), they cannot justify converting disputed factual questions into legal ones suitable for summary adjudication. The remedial nature of a statute may guide interpretation of ambiguous statutory language, but it cannot resolve genuine disputes about the application of clear legal standards to contested facts.

{¶ 59} The record contains genuine disputes of material fact regarding whether Bill's non-testamentary arrangements constitute "provision . . . by settlement" under the objective standard established by our interpretation of R.C. 2107.34(A). These disputes concern the comprehensiveness, adequacy, and structural characteristics of Bill's financial arrangements, all of which are material to determining whether the arrangements meaningfully provided for his children's future welfare in the manner the statute requires.

{¶ 60} Because genuine issues of material fact preclude summary judgment, the trial court erred in granting Evonne's motion. On remand, the factfinder must apply the correct legal standard to determine whether Bill's arrangements, considered in their totality, constitute the type of substantial, systematic provision for the children's

maintenance and welfare that the statute contemplates.

### 4. Due Process

{¶ 61} As a final matter, given our conclusion that summary judgment was inappropriate, we decline to consider the siblings' alternative argument that applying R.C. 2107.34 violates due process. *See Wardrop v. Middletown Income Tax Rev. Bd.*, 2008-Ohio-5298, ¶ 31 (12th Dist.) (declining to resolve appellants' alternative constitutional argument), citing *Hall China Co. v. Pub. Util. Comm.*, 50 Ohio St.2d 206, 210 (1977) (recognizing "that constitutional issues should not be decided unless absolutely necessary").

### 5. Conclusion

{¶ 62} The probate court erred by granting summary judgment on what is fundamentally a fact-intensive inquiry requiring careful evaluation of complex circumstances. While both parties present compelling evidence supporting their interpretations of the facts in evidence, the existence of genuine disputes of material fact makes this case unsuitable for summary judgment.

{¶ 63} We sustain the siblings' sole assignment of error.

### B. Evonne's Cross-Appeal

{¶ 64} Evonne raised one assignment of error in her cross-appeal:

> THE TRIAL COURT ERRED IN UNDERTAKING AN ANALYSIS OF WHETHER THERE WAS A "SETTLEMENT" WHEN THE SECOND SENTENCE OF R.C. 2107.34 INDEPENDENTLY COMPELS A FINDING THAT THE CHILDREN ARE PRETERMITTED HEIRS.

{¶ 65} In support of her assignment of error, Evonne argues that the probate court erred by undertaking an analysis of whether there was a "settlement" when the second sentence of R.C. 2107.34(A) independently compels a finding that the children are pretermitted heirs. We disagree with Evonne's proposed interpretation of the statute.

{¶ 66} Evonne contends that the second sentence of R.C. 2107.34(A) should be read in isolation, focusing solely on whether the will expresses an intention to disinherit the after-born children. This interpretation, however, would render the first sentence of the statute superfluous, violating a fundamental principle of statutory construction. *See State ex rel. Myers v. Bd. of Edn. of Rural School Dist. of Spencer Twp., Lucas Cty.*, 95 Ohio St. 367, 372-373 (1917).

{¶ 67} The statute must be read as a whole. As we explained above, the first sentence establishes the conditions under which the statute applies, including the absence of provision "in the will or by settlement." The second sentence then prescribes the consequence of meeting those conditions. It is only by reading these sentences together that statute can be properly understood.

{¶ 68} Evonne's cross-assignment of error is overruled.

## IV. Conclusion

{¶ 69} For the foregoing reasons, we conclude that there are genuine issues of material fact as to whether Bill's children are pretermitted heirs under R.C. 2107.34 and are entitled to inherit from his estate as if he had died intestate. Therefore the judgment of the probate court is reversed and this case is remanded for further proceedings consistent with this opinion. On remand, the probate court should apply the legal standard we have articulated to determine whether Bill's non-testamentary arrangements constitute "provision . . . by settlement" under R.C. 2107.34(A), thereby precluding his children's status as pretermitted heirs entitled to abatement of his will.

HENDRICKSON, J., concurs.

M. POWELL, J., concurs separately.

**M. POWELL, J., concurring separately.**

## CONCURRENCE INTRODUCTION

{¶ 70} For the most part, I agree with the majority opinion. However, I differ with the majority's conclusion that a "provision by settlement" under R.C. 2107.34(A) is an objective concept lacking an intent by a testator that the settlement be in lieu of an after-born child's other rights of inheritance.[3] It is for this reason that I write separately.

## OHIO'S PRETERMITTED HEIR STATUTE

{¶ 71} R.C. 2107.34(A) applies only to testate estates in which no provision is made for an after-born child, by will or otherwise. In such an instance, and depending on the circumstances, the statute directs that two inquiries be made in determining if the child may take a modified statutory share of the estate. First, does the will disclose an intention by the testator to disinherit the child. Second, if an extra-testamentary provision is made for the child, is the provision a "settlement." If either of these inquiries is answered in the affirmative, then the child is not entitled to the benefit of the statute.

{¶ 72} The purpose of the statute is to prevent inadvertent disinheritance of after-born children by requiring the inquiries discussed above. When considering the interpretation of "provision by settlement" we should recognize that it is common for parents to make extra-testamentary provisions for their children. Oftentimes parents do so with no intention that such provisions are in lieu of their children's other rights of inheritance. This is as true today as it was when the General Assembly enacted Ohio's original pretermitted heir statute. Interpreting the term "settlement" as a purely objective concept ignores the practical reality of why parents make extra-testamentary provision for their children, frustrates the statutory purpose, and permits inadvertent disinheritance

---

3. Because this case involves children born after the making of Bill's will, this concurring opinion does not speak in terms of the other categories of pretermitted heirs included in R.C. 2107.34(A).

of a child when an extra-testamentary provision for a child happens to qualify as a "settlement" pursuant to the majority's objective definition.

## THE PRETERMITTED HEIR CASES

{¶ 73} I find no significance in the lack of any reference to a "settlement" involving intent in the Ohio Supreme Court's *Rhodes v. Weldy* opinion. In *Rhodes*, the Supreme Court construed a former iteration of the pretermitted heir statute and whether a testamentary devise of a remainder interest in real property was a "provision by will." In resolving the issue, the Supreme Court first held that a "provision by will" and a "provision by settlement" are subject to the same requisites. The Court observed that because a "provision by settlement" required a "present means of maintaining the child . . . which constitutes a source of maintenance, education, etc.," then so must a "provision by will." *Rhodes*, 46 Ohio St. 234, 242-243 (1889). Because the devise was contingent, as opposed to a present interest, the Supreme Court reversed the lower courts' finding that the devise was a "provision by will." As the contingent nature of the devise was determinative, the Supreme Court had no occasion to address whether a "settlement" involved an intent that it serve in lieu of other rights of inheritance. Thus, *Rhodes* is silent on whether a "settlement" implicates an element of intent and that silence should not be interpreted as providing guidance on the issue. "A reported decision, although in a case where the question might have been raised, is entitled to no consideration whatever as settling, by judicial determination, a question not passed upon or raised at the time of the adjudication." S*tate ex rel. Gordon v. Rhodes*, 158 Ohio St. 129, 131 (1952). Furthermore, there is no suggestion in *Rhodes* that the Supreme Court announced an all-inclusive definition of "settlement." Rather, the Court addressed only the aspects of a "settlement" which were necessary to resolve the dispute before it.

{¶ 74} Until now, no court has held that a "provision by settlement" is a purely objective concept involving no intention by the testator that it serve in lieu of other rights of inheritance. However, at least two courts have recognized the contrary. The Franklin County Common Pleas Court addressed the issue in *City Natl. Bank v. Kelly*, 19 O.O. 231, 1940 Ohio Misc. LEXIS 458 (C.P. 1940), and held that a " '[s]ettlement' is a provision made extraneous to the will for the benefit of an after-born or after adopted child, with the intention on the part of the settlor that such provision shall preclude the child from taking any other portion of the testator's estate at the time of his death." *Id.* at 235. In *Twitchell v. Alexander & Liggett, Inc.*, 115 Ohio App. 51 (10th Dist. 1961), the court of appeals explicitly rejected a contention that designating an after-born child as a life insurance policy beneficiary was a settlement intended to disinherit the child: "We are unable to see how the action taken in this case with respect to the insurance is evidence of an intention to disinherit." *Id.* at 61. In so holding, the court held that the sole focus must be upon the "acts done or steps taken by . . . the testator himself as evidence of the testator's intent." *Id.*

## CONCURRENCE CONCLUSION

{¶ 75} Ignoring whether an extra-testamentary provision for a child is intended as being in lieu of other rights of inheritance promotes rather than prevents inadvertent disinheritance of after-born children. Such a construction thwarts the statute's purpose. However, construing "provision by settlement" as requiring an intention that the provision serve in lieu of the child's other rights of inheritance is consistent with the statutory purpose and avoids unintentional disinheritance.

{¶ 76} I agree that the trial court erred by granting summary judgment in favor of Bill's children by failing to construe the evidence most strongly in the siblings' favor, and that the judgment in favor of the children should be reversed and the matter remanded

for further proceedings. However, for the reasons set forth in this concurring opinion, on remand the siblings should be required to prove that the extra-testamentary provisions made for Bill's children constitute a settlement in that they were intended by Bill to serve in lieu of the children's other rights of inheritance from him.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, reversed and this cause is remanded for further proceedings according to law and consistent with the above Opinion.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas, Probate Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Matthew R. Byrne, Presiding Judge

/s/ Robert A. Hendrickson, Judge

/s/ Mike Powell, Judge